448 F.2d 245
 Steve BRIGHT, Plaintiff-Appellant, and American Association
of University Professors, University of Kentucky
Chapter, et al., Plaintiffs,
v.
Louie B. NUNN, Governor of Commonwealth of Kentucky, and
Otis Singletary, President of University of Kentucky,
Defendants-Appellees, and E. Lawson King, County Attorney of
Fayette County, Commonwealth of Kentucky, Defendant.
 No. 21022.
 United States Court of Appeals,
Sixth Circuit.
 Sept. 24, 1971.
 
 Lawrence G. Sager, American Civil Liberties Union Foundation, New York City, for plaintiff-appellant; Melvin L. Wulf, Marilyn Haft, American Civil Liberties Union Foundation, New York City, Alvin L. Goldman, William H. Allison, Jr., Lexington, Ky., on brief; Laura Sager, New York City, of counsel.
 John B. Breckinridge, Atty. Gen. of Kentucky, Frankfort, Ky., W. Scott Miller, Jr., Louisville, Ky., for Governor Louie B. Nunn.
 C. Gibson Downing, Stoll, Keenon & Park, Lexington, Ky., for Otis Singletary.
 Before WEICK, PECK and KENT, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 This appeal arises out of disorders on the campus of the University of Kentucky in Lexington, between May first and eighth, inclusive, 1970, which occurred subsequent to the incursion of United States Armed Forces into Cambodia and during the period of the Kent State tragedy in early May, 1970.
 
 
 2
 The Governor of the Commonwealth of Kentucky, defendant Louie B. Nunn, deemed it necessary to and did send units of the Kentucky State Police and National Guard to the campus to quell the disturbances and to restore order. Due to the disorders, he also imposed a curfew between 7:00 p. m. and 6:30 a. m., for two days. The President of the University of Kentucky, defendant Otis Singletary, also placed certain restrictions on mass assemblies after 5:00 p. m. during this period of time.
 
 
 3
 The present action was instituted by the University of Kentucky Chapter of the American Association of University Professors; Professor J. W. Patterson, then president of the A.A.U.P. chapter; Robert Brecht, president of the Graduate Student Association; Julie Colson, a student; and plaintiff-appellant Steve Bright, president of the student body. The action was brought in behalf of plaintiffs and that class of professors and students of the University "who desire to exercise their First Amendment rights of speech and assembly * * * and who are prohibited from doing so by Defendant Nunn's executive order * * * and Defendant Singletary's prohibition * * *." In addition to the alleged infringement of their First Amendment rights, the plaintiffs alleged that the Governor of Kentucky and the President of the University acted in bad faith and for political reasons; they also complained of the presence on campus of non-University security forces, of the lack of training of those forces, and of the arming of those forces with live ammunition. Plaintiffs sought declaratory relief determining the impropriety of the defendants' actions and permanent injunctive relief against further invasion of their asserted rights. Their claims were asserted under 42 U.S.C. Sec. 1983 and the First, Ninth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. Sec. 1331 (federal question) and 28 U.S.C. Sec. 1343(3), (4) (civil rights).
 
 
 4
 The disorders took place during the last week of the spring semester, when final examinations were being held. The disorders consisted principally of the holding of unruly mass demonstrations, sometimes extending into the night season; the setting on fire, by unknown persons, of several buildings one of which was the ROTC building and which was completely destroyed, the fire then spreading to Blazer Hall (an adjoining dormitory for women) and requiring the evacuation in the middle of the night of 175 women students who were in Blazer and Boyd Halls; the throwing of stones and rocks at buildings and the breaking of windows; the throwing of stones and rocks which hit teachers, security officers and a policeman; the breaking into and entering of a building; the disruption of a meeting of the Board of Trustees; the use of physical force against campus security officers outside that meeting; and the use of vile, abusive, and obscene language.
 
 
 5
 Plaintiffs filed a motion for a temporary restraining order, which motion did not show service on the defendants, and presented it to the District Judge sitting in the Western District of Kentucky. Counsel for plaintiffs advised the Court, however, that he had called the Attorney General's office, informing that office of the hearing, but no one appeared in behalf of the defendants. The Court declined to issue a temporary restraining order and assigned the motion for hearing on May 11, 1971, in the Eastern District of Kentucky, the District in which the University is located and wherein the alleged cause of action arose.
 
 
 6
 Prior to the hearing, namely by May 9, 1971, the disturbances had subsided, order was restored, and the National Guard and police were withdrawn from the campus. Because of this change in the situation, there was left for consideration by the Court only plaintiffs' claim for declaratory relief and for injunctive relief against similar actions in the future.
 
 
 7
 The Court conducted an extensive evidentiary hearing which lasted three days. Plaintiffs filed an amended complaint at the hearing, without objection from the defendants, substituting Professor Garrett Flickinger, the newlyelected president of A.A.U.P., as a party plaintiff, and adding as party plaintiffs a number of University students and professors who had been arrested by the National Guard and State Police for violation of the curfew and for disorderly conduct. The amended complaint also named E. Lawson King, Fayette County Attorney, as an additional party defendant, and sought to enjoin him from prosecuting the students and professors in the state court. It is significant that the complaint makes no claim that any personal injury was suffered by either a student or a professor.
 
 
 8
 At the hearing students and professors testified. The plaintiffs also called Governor Nunn and President Singletary and cross-examined them. Defendants made an oral motion at the close of all of the evidence to dismiss the complaint, which motion the Court granted.[1] Only plaintiff Bright has appealed.
 
 
 9
 Bright urges that the restrictions on speech and assembly during the period of the disturbances on the campus "unconstitutionally inhibited free expression" and that "the deployment of fully armed National Guard troops contravened the norms of due process." There can be little doubt that because of the disturbances substantial restrictions were placed upon the University community during the period in question, in order to protect lives and property. All meetings or movement about campus were banned during the hours of darkness from the evening of May 6th to the morning of May 8th, by the Governor's 7:00 p. m. to 6:30 a. m. curfew. All mass student assemblies on campus were essentially prohibited by University officials on May 6th and 7th, and several unauthorized demonstrations had to be dispersed.
 
 
 10
 Bright, president of the student body, admitted that in addressing an assembly meeting of students (at which mass meeting President Singletary had previously announced the University's prohibition against mass meetings after 5:00 p. m.) he did not intend to co-operate with the University, and that he intended to attend a mass meeting at the Armory at 4:30 p. m. that afternoon. At the assembly meeting Bright told the students "* * * they should be thankful for the burning of the building." He explained that it was preferable for the buildings to be burned rather than for the students to be injured.
 
 
 11
 On Tuesday evening, May 5th, students had assaulted University police officers with stones and bricks, had vandalized the exterior of Buell Armory, and had broken into the women's gym portion of the Armory.
 
 
 12
 At a meeting held on campus on May 1, 1970, to protest the policy of the President of the United States with respect to Cambodia, various speakers, referring to the ROTC building, Buell Armory, stated that students "should occupy, stone it or burn it." Previously, on April 1, 1970, following a speech by William Kunstler, Mason Taylor, a student who had been passing out matches, told the group:
 
 
 13
 "There is that * * * ROTC building. Let's burn it down."
 
 
 14
 The statement about burning the ROTC building was repeated in another meeting held during the last week of April, following a candlelight procession.
 
 
 15
 As the defendants recognize,-
 
 
 16
 "* * * [A]ny attempt to restrict those liberties [freedom of speech and assembly] must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 630 (1945).
 
 
 17
 There was not a scintilla of evidence that either Governor Nunn or President Singletary acted in bad faith or that they were motivated by politics in entering the orders which they did. The evidence established conclusively that they were confronted with an emergency-a clear and present danger. They acted with courage and dispatch to quell the disorders, to save lives, and to protect property. Bomb threats had been received. The Governor had received reports of outside agitators on campus with guns, dynamite and Molotov cocktails. The Governor visited the campus prior to his calling out the National Guard, and he was personally familiar with conditions. Dean Hall had a list of twenty-one nonstudents who had been active in campus disorders, of whom four were identified as convicted felons and one as a convicted arsonist. Colonel Crutchfield, Director of the Kentucky State Police, advised the Governor that he did not have enough officers to protect buildings from further fires. Colonel Crutchfield was of the opinion that there was a clear and present danger to lives and property, and that it was necessary to activate the National Guard in order to secure the University property and to protect people on campus. There were about ten thousand students on the campus at that time plus thousands of employees.
 
 
 18
 It is clear that the action taken by the Governor and the President of the University did bring about a cessation of hostilities on the campus and prevented further property damage.
 
 
 19
 No effort was made by either the Governor or the President of the University to interfere with off-campus activities.
 
 
 20
 The District Judge held from the evidence that both the Governor and the University President had acted properly and in good faith, and that they were fully justified in doing what they did.
 
 
 21
 The claim that the Governor and the University President violated the First Amendment rights of Bright and the class he represents, is unsubstantial.
 
 
 22
 Freedom of speech is not an absolute. As Mr. Justice Holmes said in Schenck v. United States, 249 U.S. 47, at 52, 39 S.Ct. 247, at 249, 63 L.Ed. 470 (1919):
 
 
 23
 "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force."
 
 
 24
 In Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), a divided court equated the wearing of armbands by school children to "symbolic" free speech. That decision, however, gives no support to the type of conduct involved here. In that case the Court was careful to point out:
 
 
 25
 "As we shall discuss, the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it." (p. 505, 89 S.Ct. p. 736)
 
 
 26
 "But conduct by the student, in class or out of it, which for any reason- whether it stems from time, place, or type of behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." (p. 513, 89 S.Ct. p. 740)
 
 
 27
 Fifteen thousand students attended the University of Kentucky, and there were thousands of employees. Less than eight hundred students were involved in the disturbances. They had no right to disturb and endanger the lives of students who were attending college for the purpose of securing an education. They had no right to interfere with the lawful operation of the University by its trustees, or to inflict damage upon the University's property or injury to its employees.
 
 
 28
 There can be no question of the right of the school officials to prescribe and control conduct in the schools. This was recognized in Tinker, supra (at 507, 89 S.Ct. 733), and by us in Norton v. Discipline Committee of East Tenn. State Univ., 419 F.2d 195 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970).
 
 
 29
 School officials must be given wide authority in maintaining discipline and good order on campus. This cannot be accomplished if students are permitted to flout their teachers and disobey lawful orders issued by the state's highest officer during an emergency.
 
 
 30
 We see no basis here for federal interference with the state's disciplinary procedures in the operation of its schools.
 
 
 31
 As was stated in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968):
 
 
 32
 "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."
 
 
 33
 Bright also contends that the police could have handled the disorders and that it was unnecessary for the Governor to send the National Guard to the campus. This was a matter addressed to the sound discretion of the Governor and we do not find that it was abused.
 
 
 34
 Bright also claims that the guard and police were untrained for campus disorders and that they were permitted to carry guns with live ammunition. There is no proof to support the claim that the guards and police were untrained. In any event, the claim does not reach constitutional proportions.
 
 
 35
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 Normally, plaintiffs would be entitled to a full trial on the merits of their claims, but a full trial may be advanced and consolidated with an evidentiary hearing on a motion for preliminary injunction. Rule 65(a) (2), Fed.R.Civ.P. The District Judge may also dismiss the complaint upon the close of the plaintiffs' proofs where "the plaintiff has shown no right to relief." Rule 41(b), Fed.R.Civ. P. We think that the facts disclosed by the record are uncontested in the decisive respects of this case, and we therefore conclude below that the District Court could properly dismiss the action upon the present state of the record