Craig MORGAN et al., Plaintiffs-
Appellants,

v.

James RHODES et al., Defendants-
Appellees.

No. 71-1335.

United States Court of Appeals,
Sixth Circuit.

Feb. 15, 1972.

Celebrezze, Circuit Judge, filed opinion concurring in part and dissenting in part.

Sanford Jay Rosen, New York City, Harold Weinstein, Cleveland, Ohio, on brief; Michael E. Geltner, Stanley K. Laughlin, Columbus, Ohio, Melvin Wulf, Sanford Jay Rosen, Lawrence Sager, New York City, of counsel, for plaintiffs-appellants.

Michael R. Grove, Columbus, Ohio, William J. Brown, Atty. Gen., Thomas V. Martin, Asst. Atty. Gen., Columbus, Ohio, on brief, for defendants-appellees.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

In this case certain students at Kent State University, including officers of the Student Association, and other student organizations, seek broad injunctive relief against the Governor of Ohio and the commanding officers of the Ohio National Guard, and a declaratory judgment, declaring unconstitutional a certain immunity statute, Ohio Rev.Code § 2923.55 (Supp.1969). The complaint was brought under 42 U.S.C. § 1983 (1970), with jurisdiction asserted under 28 U.S.C. § 1343(3) (1970).

The District Judge dismissed the complaint on motion without either answer or affidavits being filed by appellees,

and without hearing. His brief order stated that the pleading failed to state a claim cognizable under federal law.

The disposition employed by the District Judge is, of course, the least favored judgment which the appellate courts review. Here the issues (assuming for the moment some triable issues were stated) have never become joined. Appellees have never even filed either answer or motion for summary judgment supported by affidavits.

When a case comes to us in such a posture, we are compelled to assume the truth of all of the plaintiffs' allegations of fact, plus the reasonable inferences which flow from those facts.

This court has recently restated these principles:

"This cause having come before this Court on a dismissal, the allegations of the complaint must be taken as true, and any legitimate inferences arising therefrom must be construed in favor of the Appellants. *See* Jenkins v. McKeithen, 395 U.S. 411, 423–424, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959); Taylor v. Kentucky State Bar Association, 424 F.2d 478, 480 (6th Cir. 1970)." Honey v. Goodman, 432 F.2d 333, 336 (6th Cir. 1970).

This fundamental statement of the same principles is found in a unanimous United States Supreme Court decision:

"In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim uness it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.[5]

"5. *See, e. g.*, Leimer v. State Mutual Life Assur. Co., [8 Cir.] 108 F.2d 302; Dioguardi v. Durning, [2 Cir.] 139 F.2d 774; Continental Collieries v. Shober, [3 Cir.] 130 F.2d 631."

Conley v. Gibson, 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

No one is under our system of law turned away from the courthouse door without a proper adjudication if he has filed a sworn complaint which is cognizable in our law.

With these principles in mind, we turn to analyze the instant complaint. We believe that fairly read it seeks to state three related causes of action:

1) In the first instance the complaint is an attack upon the "premature" calling out of the Ohio National Guard by Governor Rhodes on May 1, 1970, and its dispatch to the campus of Kent State University "to displace civilian authority." The relief sought is an injunction against such "premature" employment of the Guard on future occasions.

2) The complaint also constitutes an attack upon the conduct of the Guard troops upon their arrival at Kent State. Here the allegations are that the defendants, who controlled the troops, without necessity for doing so violated the students' rights of speech and assembly, made unconstitutional arrests, beat and injured students "needlessly" and employed live rifle fire against an unarmed crowd and killed and injured a number of students without appropriate legal justification. In this phase of the complaint the allegations also are that these claimed violations resulted from policies and practices of defendants which constitute a continuing pattern of conduct which threatens plaintiffs with future such violations.

3) The complaint also seeks a declaratory judgment finding unconstitutional an Ohio Statute, Ohio Rev.Code § 2923.-55 (Supp.1969), which under certain detailed circumstances purports to grant immunity to National Guard troops (and other law enforcement personnel) from criminal charges arising out of their activities in suppressing riots. Each of these causes of action (although dismissed as a whole) deserves separate consideration.

*I   The Attack Upon the Executive Emergency Power*

In this aspect of this appeal appellants ask the courts to engage in prior restraint upon the exercise of emergency power specifically committed by constitution to the executive branch of government. In this phase of the pleading we find no facts which call for hearing, no relief sought which the court below could appropriately have granted, and no allegations of a breach of actionable rights. As to this aspect of the case, we affirm the District Court.

At the outset, this complaint concedes that there was disorder which had not been terminated by normal civilian controls and that such disorders were continuing as of the time the Governor called out the troops. The complaint says:

"10.   On or about May 1, 1970, there occurred certain disorders in the area of the Kent campus which resulted in the imposition of a curfew by the mayor of Kent. Thereafter, demonstrations and disorders continued in and about the Kent campus."

Executive decisions to call out military force have been litigated a number of times in the history of the Republic. Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946); Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932); Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909); Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866); Luther v. Borden, 7 How. 1, 48 U.S. 1, 12 L.Ed. 581 (1849); Martin v. Mott, 12 Wheat. 19, 25 U.S. 19, 6 L.Ed. 537 (1827). But we find no instance where the courts have sought to substitute judicial judgment for the constitutionally empowered judgment of the executive. Still less have the courts cumbered that executive judgment with the prior restraint of an injunction seeking to describe in advance the precise conditions which would make its exercise appropriate.

Indeed, in the case principally relied upon by appellants, the Supreme Court of the United States said:

"As the state has no more important interest than the maintenance of law and order, the power it confers upon its Governor as chief executive and commander in chief of its military forces to suppress insurrection and to preserve the peace is of the highest consequence. The determinations that the Governor makes within the range of that authority have all the weight which can be attributed to state action, and they must be viewed in the light of the object to which they may properly be addressed and with full recognition of its importance. It is with appreciation of the gravity of such an issue that the governing principles have been declared.

"By virtue of his duty to 'cause the laws to be faithfully executed,' the executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive. That construction, this Court has said, in speaking of the power constitutionally conferred by the Congress upon the President to call the militia into actual service, 'necessarily results from the nature of the power itself, and from the manifest object contemplated.' The power 'is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union.' Martin v. Mott, 12 Wheat. 19, 29, 30, [6 L.Ed. 537]. Similar effect, for corresponding reasons, is ascribed to the exercise by the Governor of a state of his discretion in calling out its military forces to suppress insurrection and disorder. Luther v. Borden, 7 How. 1, 45, [12 L.Ed. 581]; Moyer v. Peabody, 212 U.S. 78, 83, [29 S.Ct. 235, 53 L.Ed. 410.]." Sterling v. Constantin, 287 U.S. 378, 399, 53 S.Ct. 190, 195–196, 77 L.Ed. 375 (1932).

Recently the Fourth Circuit provided some of the practical logic for our decision on this point:

"The responsibility for maintaining public peace on a day-to-day basis is lodged with the executive branch of government. As we recently have become all too painfully aware, public peace in our cities may be suddenly breached by massive civil disorder. Dealing with such an emergency situation requires an immediacy of action that is not possible for judges. We think it would be highly inappropriate for us, removed from the primary responsibility for maintaining order and with the benefit of time for reflection not available to the mayor, to substitute our judgment of necessity for his." United States v. Chalk, 441 F.2d 1277, 1281 (4th Cir. 1971).

*II   The Alleged Continuing Threats to Constitutional Rights*

As to the second cause of action sought to be pled, we quote in full the relevant language from the complaint:

"On May 4, 1970, members of the Ohio National Guard fired their guns into a crowd of persons on the Kent State University main campus, injuring several students and killing four. The culpable and legally unjustified shooting of unarmed civilians by Ohio National Guard troops deprived such persons of life and liberty without due process of law.

\*   \*   \*   \*   \*   \*

"(b) Defendants failed to adequately provide Ohio National Guard troops with specialized training in control of civilian disorders or to provide them, when assigned to the Kent campus, with adequate equipment for dealing with civilian disorders by means other than the use of deadly force when such equipment, better adapted for dealing with civilian disorders than that utilized by the Ohio National Guard troops at the Kent campus, was available. Defendants also caused and ordered Ohio National Guard troops to carry live bullets ready for firing in their guns when on duty in and about the Kent campus. The use of inadequately trained troops, their lack of equipment adapted for control of civilian disorders, and the use by Ohio National Guard troops of guns loaded with live bullets to control civilian disorders substantially increased the risk of the injuries and killings which occurred and, therefore, the deprivations of life and liberty without due process of law which occurred on May 4, 1970. This risk remains and constitutes a real threat to plaintiffs and other students of further deprivations of life and liberty without due process of law. Defendants continue to inadequately train Ohio National Guard troops for civilian disorder control, continue to fail to equip them with adequate equipment for dealing with civilian disorders and to cause and order them to carry live bullets loaded in their guns while on duty during civilian disorders. In addition, defendnts have failed to instruct and order Ohio National Guard troops to limit their use of deadly force during civilian disorders to those instances in which deadly force could lawfully be used by police officers.

"(c) Defendants permitted and caused Ohio National Guard troops to (1) engage in unlawful and unjustified beatings of students in and around the Kent campus. Beatings were administered to some students by Ohio National Guard troops, in part as a result of the exercise of the rights of speech and assembly by students who were beaten, and others. Defendants also permitted and caused Ohio National Guard troops to unlawfully detain, and cause to be detained, students, some as a result of the exercise by such students, and others, of the rights of speech and assembly. These actions of defendants, and their agents, have deprived persons of liberty without due process of law constituted a direct punishment without due process of law for the exercise of rights protected by the First and Fourteenth Amendments

to the United States Constitution. Because of the past actions of defendants' agents and defendants' continued excessive use of Ohio National Guard troops to displace civilian authority during campus disorders, there remains a very real threat that plaintiffs and other students will be subjected to similar beatings and detentions in the future and thereby be deprived of the same rights. The threat of such punishment for exercise of rights protected by the First and Fourteenth Amendments inhibits and intimidates plaintiffs and other students in their exercise of such rights.

"(d) Defendants caused and ordered Ohio National Guard troops to break up lawful and peaceable meetings, demonstrations and assemblies in and about the Kent campus and thereby deprived plaintiffs and other students of their rights of speech, assembly, association and petition of government. The meetings, demonstrations and assemblies broken up were, in part, protesting against the occupation of the campus by a military force. Defendants' actions violated the First and Fourteenth Amendments to the United States Constitution and substantially increased the risk of the unjustified killings and injuries which occurred on the Kent campus of May 4, 1970. They were not legitimatized by the application of concepts of Martial Law, because there was neither an invasion nor breakdown of civilian authority. Moreover, to the extent that any provision of Ohio law either authorize the imposition of Martial Law except during time of invasion or breakdown of civil authority, or authorize a suspension of First Amendment rights as a consequence of the declaration of Martial Law, lawful or otherwise, they violate the First and Fourteenth Amendments to the United States Constitu-

tion. Defendants' past action in ordering Ohio National Guard troops to break up lawful assemblies creates a real threat to plaintiffs and other students that, if they participate in lawful activities they will be assaulted, killed, injured or unlawfully detained by Ohio National Guard troops." [1]

The question which we think these paragraphs serve to pose, when the complaint is read with the fair inferences which may be deduced from it, is this: Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?

■ A citizen complaint that state action threatens federally protected rights is, of course, cognizable in the federal courts under the due process clause of the Fourteenth Amendment:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

In Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), the same case we have previously relied upon in affirming dismissal of the first phase of this case, the Supreme Court affirmed a federal District Court's injunctive relief against the Governor of Texas and other state officials who under claim of military necessity had taken over control of privately owned oil fields. The Supreme Court there held:

"When there is a substantial showing that the exertion of state power has overriden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed

1. In relation to these portions of the pleading, cf. Prevention and Control of Mobs and Riots, Federal Bureau of Investigation, U.S.Dept. of Justice, J. Edgar Hoover, 89–91 (1967), quoted in Ap-

pendix to this opinion. It is recognized that the policies outlined may set standards higher than those imposed by the Constitution.

against the individuals charged with the transgression. To such a case the federal judicial power extends (Article 3, § 2), and, so extending, the court has all the authority appropriate to its exercise. Accordingly, it has been decided in a great variety of circumstances that when questions of law and fact are so intermingled as to make it necessary, in order to pass upon the federal question, the court may, and should, analyze the facts. Even when the case comes to this Court from a state court, this duty must be performed as a necessary incident to a decision upon the claim of denial of federal right. Kansas City Southern Ry. Co. v. [C. H.] Albers Commission Co., 223 U.S. 573, 591, [32 S.Ct. 316, 56 L.Ed. 556;] Creswill v. [Grand Lodge] Knights of Pythias, 225 U.S. 246, 261, [32 S.Ct. 822, 56 L. Ed. 1074;] Northern Pacific Ry. Co. v. North Dakota, 236 U.S. 585, 593, [35 S.Ct. 429, 59 L.Ed. 735;] Union Pacific R. Co. v. Public Service Commn., 248 U.S. 67, 69, [39 S.Ct. 24, 63 L.Ed. 131;] Merchants' National Bank v. Richmond, 256 U.S. 635, 638, [41 S.Ct. 619, 65 L.Ed. 1135;] First National Bank v. [City of] Hartford, 273 U.S. 548, 552, 553, [47 S.Ct. 462, 71 L.Ed. 767;] Fiske v. [State of] Kansas, 274 U.S. 380, 385, 386, [47 S.Ct. 655, 71 L. Ed. 1108.]" Sterling v. Constantin, *supra* at 398, 53 S.Ct. at 195.

In another important case the Supreme Court affirmed a federal District Court's order, entered in the every midst of war, restoring the authority of the civilian courts of the territory of Hawaii as to nonmilitary criminal cases. Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946).

Even more obvious recognition of federal judicial power to vindicate federal Constitutional rights claimed to be abused by state power is found in recent cases in United States Courts of Appeals. Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966); Build of Buffalo, Inc. v. Sedita, 441 F.2d 284 (2d Cir. 1971).

In a recent decision the United States District Court for the Eastern District of Kentucky has conducted a full hearing on somewhat similar complaints pertaining to state actions concerning disorders on the campus of the University of Kentucky. The complaint therein was dismissed after a hearing on the facts and this court has affirmed that decision. Bright v. Nunn, 448 F.2d 245 (6th Cir. 1971).

The partial dissent in this case relies basically on a form of abstention usually referred to as the political question doctrine. At the height of its influence in the federal courts, it caused the courts to abstain from adjudicating many asserted federal constitutional violations in fields as widely diverse as voting rights and the rights of prisoners in correctional institutions. The diminished vitality of the political question doctrine is specifically illustrated in such voting rights cases as Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and in such prisoner rights cases as Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) and Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971).

It is worth emphasizing that the *Haines* case came down on January 13, 1972, from a unanimous Supreme Court.

There is a hint in the dissent that perhaps the Constitution conveys to the Executive and to Congress such powers over the military forces as to exclude any form of judicial review. No express language of the Constitution may be found which even arguably supports such a proposition when it is applied to the use of military force in domestic affairs. Cases we have cited previously (Duncan v. Kahanamoku, *supra*; Sterling v. Constantin, *supra;* Ex parte Milligan, *supra*) stand in flat contradiction to this proposition. *See also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

Obviously, if the control of ultimate force were in the hands of the Executive alone, constitutional government in our democracy would rest entirely upon the will (and whim) of one man.

The final point made by the dissent is that there is no conceivable form of relief which the District Court could have rendered. Far more applications for injunctive relief are filed, heard and denied on the merits in the federal courts than are ever granted, and such, of course, may well prove to be the case when the issues here sought to be presented are actually the subject of proofs. Nonetheless, the right to be heard is itself a constitutional right of vital importance.

Further, if the District Court after evidentiary hearing were to find from the facts developed before it that an affirmative answer should be made to the summary question previously phrased in this opinion, we have no doubt that the District Court will find much material available for devising a suitable remedy. *See,* for example: Prevention and Control of Mobs and Riots, Federal Bureau of Investigation, U.S. Dept. of Justice, J. Edgar Hoover (1967) (See Appendix to this opinion.); 32 C.F.R. § 501 (1971), "Employment of Troops in Aid of Civil Authorities"; Instructions for Members of the Force at Mass Demonstrations, Police Department, City of New York (no date); Report of the National Advisory Commission on Civil Disorders (1968).

As to further speculation on the form of relief, we follow the Supreme Court admonition in Baker v. Carr, *supra*:

"Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial." Baker v. Carr, *supra* 369 U.S. at 198, 82 S.Ct. at 699.

As to this phase of this complaint, the case is remanded for further proceedings consistent with this opinion.

### III   The Attack on the Constitutionality of Ohio Rev. Code § 2923.55

The third cause of action upon which plaintiffs sought adjudication was, we believe, properly dismissed below.

The relief sought concerning the statute was a declaratory judgment and no injunctive relief as to this issue was prayed for.

■ The statute attacked has never been construed by the appellate courts of Ohio. Viewing the statute on its face, we perceive no substantial federal constitutional issue.

The statute reads:

"§ *2923.55   Death or injury of rioter by use of necessary force.*

Police officers, special police officers, sheriffs, deputy sheriffs, highway patrolmen, other law enforcement officers, members of the organized militia, members of the armed forces of the United States, and firemen, when engaged in suppressing a riot or in dispersing or apprehending rioters and after an order to desist and disperse has been issued pursuant to section 2923.51 of the Revised Code, are guiltless for killing, maiming, or injuring a rioter as a consequence of the use of such force as is necessary and proper to suppress the riot or disperse or apprehend rioters. This section does not relieve a member of the organized militia or armed forces of the United States from prosecution by court-martial for a military offense." Ohio Rev.Code § 2923.55 (Supp.1969).

What this language purports to do is to grant immunity to policemen, firemen and members of the armed forces from prosecution for killing, maiming or injuring a rioter during a riot "as a consequence of the use of such force as is necessary and proper to suppress the riot or disperse or apprehend rioters." On its face before the immunity came into existence, this statute would seem to call for proofs that a riot existed, that there had been an order to desist and disperse which had been defied, and that force

had been required to suppress the riot. The statute might be argued to grant immunity from prosecution as a result of the use of lethal force against "rioters" where the circumstances above were present; but this immunity would only come into being where the use of such lethal force was "necessary and proper." The necessary and proper language appears to us (as apparently it did to the District Judge) to be an approximation of the reasonable cause standard of the common law applicable to the use of fatal force. Schweder v. Baratko, 103 Ohio App. 399, 143 N.E.2d 486 (1957); Skinner v. Brooks, 74 Ohio App. 288, 58 N.E. 2d 697 (1944); 6 C.J.S. Arrest § 13a at 612 (1937).

If it be contended that contrary to the construction above this statute has been construed by the Ohio National Guard as authorizing the use of fatal force, even if under the circumstances lesser force would serve to restore order, such proofs would be admissible under the second issue as to which we are remanding this case, and appropriate relief could be granted thereunder.

It remains, of course, to be determined in the District Court under Rule 23 and 23.2 of the Federal Rules of Civil Procedure whether or not plaintiffs are appropriate representatives of the class they purport to represent and whether or not, as appellees contend, the United States is a necessary party to this suit.

Reversed and remanded for further proceedings in accordance with this opinion.

## APPENDIX

### V. EMPLOYMENT AND APPLICATION OF FORCE

The basic rule, when applying force, is to use only the minimum force necessary to effectively control the situation. Unwarranted application of force will incite the mob to further violence, as well as kindle seeds of resentment for police that, in turn, could cause a riot to recur. Ill-advised or excessive application of force will not only result in charges of police brutality, but also may prolong the disturbance. The major portion of persons constituting a mob may be law-abiding citizens who have been driven or led to participate in a lawless act because of their belief in a cause.

For many, the mere appearance (Show of Force) of police who represent law and order will be sufficient to bring them to their senses and they will obey the order to leave peaceably. The application of force by degrees will, in turn, cause more to realize their error and they, too, will depart. Applying force by degrees insures that the maximum force employed to restore order was applied to the most violent and lawless individuals only. The degrees and the order of the application of force should be decided in advance of the operation, and preferably included in the plan. All officers involved in the operation must be aware of these degrees and must know when each is to be applied and by whose authority. This is not meant to imply that police should not meet force with greater force; it does mean that unnecessary bloodshed must be avoided whenever possible.

Within the military establishment, the following is the priority or sequence of force applied:

1. Unload rifles with bayonets fixed and sheathed.

2. Unload rifles with bare bayonets fixed.

3. Tear Gas (CS & CN)

4. Loaded rifles with bare bayonets fixed.

A similar priority of force should be decided by each police agency, based upon the weapons and equipment available to that department for use in riot control duty.

There are numerous items of equipment available to the police for use in controlling riots. The following is a discus-

sion and analysis of some of the more common items and techniques:

### A. *Firearms*

The most extreme action which a law enforcement officer can take in any situation is the use of firearms. Under no circumstances should firearms be used until all other measures for controlling the violence have been exhausted. Above all, officers should never fire indiscriminately into a crowd or mob. Such extreme action may result in injury or death to innocent citizens and may erupt into a prolonged and fatal clash between the officers and the mob. The decision to resort to the use of firearms is indeed a grave one. Such a decision must be based upon a realistic evaluation of the existing circumstances. Among the important considerations, of course, are the protection of the officer's own life, as well as the lives of fellow officers, and the protection of innocent citizens. A basic rule in police firearms training is that a firearm is used only in self-defense or to protect the lives of others.

The firing of weapons over the heads of the mob as a warning is objectionable. In addition to the possibility of injuring innocent persons by ricocheted bullets or poorly aimed shots, the firing may only incite the mob to further violence, either through fear or anger. At best, this is a bluffing tactic and a basic rule when dealing with a mob is NEVER BLUFF.

The possibility of receiving sniper fire cannot be overlooked. A sniper must be dealt with rapidly and severely. If permitted to operate, a sniper will not only pin down the police force but will remain a threat to human life—both police and citizens. To effectively handle a sniper, it may be necessary to employ a counter-sniper, equipped and trained in the use of high-powered, telescopic-equipped rifles. Police officers, crouched behind any means of protection available and firing their service revolvers or shotguns aimlessly at a building or rooftop, are endangering lives and, at the same time, are prevented from accomplishing their mission.

### B. *Bayonets*

The mere presence of a bayonet in the hands of an officer has a deterrent effect. This does not mean that a bayonet should be used as a night stick or baton; if used, it should be a part of the weapon and is appropriate for use with the standard shotgun. If a special unit, such as the Riot Squad, is to be used and is equipped with shotguns, the bayonet is effective in the Show of Force and when engaged in the standard riot control formations.

### C. *Fire Hoses*

Water from fire hoses may be effective in moving small groups, in moving groups on a narrow front, or in defending a defile or roadblock. Water has been used in the recent past and has a psychological, as well as a physical effect. Water may be employed in two ways; as a flat trajectory weapon utilizing pressure, or as a high trajectory weapon akin to heavy rainfall. The latter method is especially effective during cold weather. If water is used in such ways, a harmless dye can be mixed into the stream for possible later identification of the rioters. Employed as a flat trajectory weapon, utilizing the pressure to physically move individuals, serious injury or death can result. The decision to employ water, in one or both methods, should be arrived at during the planning phase and should be based on the discretion of police and community officials.

### D. *Dogs*

Some police departments have found that dogs are an asset in police work. Dogs also serve to protect the officer. However, both the dogs and handlers must be well trained and disciplined. Use of dogs to confront the demonstrators has sometimes produced resentment and ill feeling on the part of the public in general. Dogs can be employed effectively at roadblocks and by foot patrols operating in an area previously cleared of rioters. However, as a general rule, dogs should not be used when confronting the mob, particularly during the Show of Force phase when their

presence could serve to furnish the spark that would ignite the riot.

### E. Horses

As with dogs, use of horses, on some occasions, has resulted in ill feeling on the part of the public. However, horses may be effectively employed on the periphery to control spectators and prevent their entry into the troubled area. If a situation has seriously deteriorated and it is necessary to eject leaders from the midst of the mob, horses employed in a diamond formation may be used to escort the arresting officers through the mob and to provide security for them during their return to police lines. Horses may also be used effectively in blocking positions to control the movement of the mob. Under no circumstances should horses be used to "charge" the mob.

### F. Batons

The baton is an adaptable instrument which can be used as an offensive or defensive weapon. It must, however, be used properly and judiciously to obtain the desired results and, at the same time, avoid criticism of the police officer and the agency he represents. When facing a crowd or mob, the baton should be held *with both hands, the palm of the right* hand down and the palm of the left hand up with the hands close to the ends. The baton should be used only in an emergency, and when blows are struck, it should be with the intention of stunning or temporarily disabling, rather than inflicting injury. Blows to the head should be avoided. The baton used as an extension of the arm is *generally more effec*tive than when used as a bludgeon, or club. Officers equipped with the baton must be thoroughly trained in its use, including the manual of the baton performed in unison as a unit or team.

### G. Chemical Agents

Law enforcement agencies have two objectives when using chemical agents in riot control situations. The first is to prevent violence by the rioting group, and the second is to disperse the crowd with minimum hazard to the individuals in the mob and to the officers engaged in the operation. Prior to the use of chemical agents, it must be established that the mob has an avenue of escape; if not, panic could result. Chemical agents, properly employed, provide the police commander with a distinct advantage; they can negate the numerical superiority the mob has over the police force. They are the most effective and most humane means of achieving temporary neutralization of a mob with a minimum of personal injury. Chemical agents should not be used or threatened to disperse demonstrators who are not in fact endangering public safety and security. (Emphasis added.) Prevention and Control of Mobs and Riots, Federal Bureau of Investigation, U.S. Dept. of Justice, J. Edgar Hoover, 89–91 (1967).

CELEBREZZE, Circuit Judge (concurring in part and dissenting in part).

I concur with the majority in their affirmance of the District Court with respect to the first and third causes of action as described above. I respectfully dissent, however, from the majority's decision to reverse the District Court's dismissal of the second cause of action.

As it has been liberally construed by the majority, the second cause of action challenges the training, weaponry, and orders of the Ohio National Guard which allegedly make inevitable the unnecessary use of lethal and nonlethal force in controlling civil disorders. This pattern of training, weaponry, and orders is said to have caused the allegedly unwarranted use of both lethal and nonlethal force on the Kent State campus in May of 1970, in deprivation of the First and Fourteenth Amendment rights of Appellants and others similarly situated, and it poses a continuing threat to their present and future exercise of those rights. To remedy this asserted threat to their constitutional rights, Appellants seek broad injunctive and declaratory relief against the Governor of Ohio and Ohio National Guard officials to prevent a recurrence of the allegedly unwarrant-

ed use of force which is said to have taken place in May of 1970.

I disagree with the majority's conclusion that the District Court erred in dismissing this portion of the complaint as failing to state a claim upon which relief could be granted. I find no conceivable relief which the District Court could have granted had it proceeded to hear evidence in support of these claims and determined that all of the facts alleged were true. In this respect, I recognize that "[t]he question of the propriety of remedies prayed for by plaintiffs . . . is not the issue on this appeal." Build of Buffalo, Inc. v. Sedita, 441 F.2d 284, 288 (2d Cir. 1971). However, the question of whether there exists *any* conceivable form of relief which the District Court could have granted in response to Appellants' claims certainly is an issue on this appeal.

With respect to the injunctive relief which is sought to cure the alleged threat posed by the pattern of training and weaponry of the Ohio National Guard, I am unable to escape the conclusion that any such relief would present a nonjusticiable political question. The Supreme Court's most recent and thorough discussion of the political question doctrine appears in Baker v. Carr, 369 U.S. 186, 208–226, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). There the Supreme Court set forth the following characteristics of nonjusticiable political questions:

> "It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. at 710.

In considering whether the voting rights asserted in Baker v. Carr constituted nonjusticiable political questions, the Supreme Court noted that "[u]nless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.*

In the present case, I believe that every one of the above formulations is "inextricable" from the second cause of action to the extent that it requires judicial intervention in National Guard training and weaponry. I find a "textually demonstrable constitutional commitment" of National Guard training and weaponry to a coordinate political department under Article I, Section 8, Clause 16, of the United States Constitution, which provides that Congress shall have the power

> "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

Pursuant to this constitutional authority, Congress has enacted legislation which governs the training and weaponry of the National Guard. 32 U.S.C. §§ 501–507, 701. Moreover, Congress has expressly provided that

> "The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard." 32 U.S.C. § 110.

And under 32 U.S.C. § 108, the President has available the following means by which to enforce any regulations which he or the Congress may prescribe for the National Guard:

"If, within a time to be fixed by the President, a State does not comply with or enforce a requirement of, or regulation prescribed under, this title its National Guard is barred, wholly or partly as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law." [1]

This power to prescribe and enforce regulations for the training and weaponry of the National Guard, which Congress has delegated in part to the President, is more than a mere token and unexercised authority. In July of 1967, when civil disorders had come to the forefront of national concern, President Johnson announced that he had ordered the addition of special training courses to the existing National Guard training program. Weekly Compilation of Presidential Documents, Vol. 3, No. 30, at 1056 (1967). Moreover, under the authority delegated to the President, the Department of the Army has specifically set mandatory riot-control training requirements for all Army National Guard and certain Air National Guard units. *See* Report of the National Advisory Commission on Civil Disorders, *supra*, at 505.

I believe that the congressional and executive authority to prescribe and regulate the training and weaponry of the National Guard, as set forth above, clearly precludes any form of judicial regulation of the same matters. I can envision no form of judicial relief which, if directed at the training and weaponry of the National Guard, would not involve a serious conflict with a

"coordinate political department; . . . a lack of judicially discoverable and

manageable standards for resolving [the question]; . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; . . . an unusual need for unquestioning adherence to a political decision already made; [and] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Baker v. Carr, *supra*, 369 U.S. at 217, 82 S.Ct. at 710.

Any such relief, whether it prescribed standards of training and weaponry or simply ordered compliance with the standards set by Congress and/or the Executive, would necessarily draw the courts into a nonjusticiable political question, over which we have no jurisdiction.

The question remains whether, upon the claims stated in the second portion of the complaint, the District Court could have granted any injunctive relief which would not have entailed judicial involvement in the training and weaponry of the National Guard. The majority relies heavily on Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966), and Build of Buffalo, Inc. v. Sedita, 441 F.2d 284 (2d Cir. 1971), apparently for the proposition that injunctive relief might be available against specific conduct by the Ohio National Guard which threatens Appellants' constitutional rights. Any such injunctive relief directed at specific unlawful conduct of the National Guard, apart from the training and weaponry of the Guard, would seemingly avoid the political question problem discussed above. Nonetheless, I believe that any such injunctive relief is unavailable to Appellants in re-

---

1. The potential effectiveness of this sanction is evidenced by the fact that "[t]he Federal Government pays for 90 percent of the operating costs, virtually all of the equipment, and nearly half of the cost

of the physical installations and facilities" of the National Guard. Report of the National Advisory Commission on Civil Disorders at 498 (Bantam ed. 1968).

sponse to the claims in their second cause of action.

In Sterling v. Constantin, *supra*, the conduct and specific acts of the National Guard in response to civil disorders were not at issue. As the Supreme Court noted:

"Fundamentally, the question here is not of the power of the Governor to proclaim that a state of insurrection, or tumult, or riot, or breach of the peace exists, and that it is necessary to call military force to the aid of the civil power. Nor does the question relate to the quelling of disturbances and the overcoming of unlawful resistance to civil authority. The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil." 287 U.S. at 401–402, 53 S.Ct. at 196–197.

That the *Sterling* decision did not authorize federal courts to grant injunctions against the future conduct of the National Guard in the face of civil disorders is further evidenced by the Supreme Court's recognition of the discretion which must be employed in such emergency situations:

"The nature of the power [of a governor to call out the militia to suppress insurrection and disorder] also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for, without such liberty to make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the executive in the exercise of his authority to maintain peace." 287 U.S. at 399–400, 53 S.Ct. at 196.

As the majority notes, the complaint concedes that when the Ohio National Guard troops were deployed to the Kent State campus in May of 1970, there existed disorders which had not been brought under control by the civilian authorities. Therefore, any injunctive relief which the District Court might have granted to curb certain conduct of the Guard troops would have restricted the discretion which the Governor and the National Guard officials must be free to exercise in the face of future disorders.

I am not suggesting that in a proper case, federal courts are barred from undertaking an after-the-fact review of National Guard conduct which has allegedly deprived persons of their constitutional rights. Nor am I suggesting that National Guard troops could never be the subject of some form of injunctive restraint in their conduct in quelling civil disorders. Rather, I simply believe that such an injunction cannot be issued when the future conduct to be restrained— such as the Ohio National Guard's allegedly unlawful disruption of speeches and assemblies, arrests, and use of nonlethal and lethal force which are challenged here—necessarily rests upon the exercise of discretion by state officials in response to a given civil disorder. In this respect, I believe that Lankford v. Gelston and Build of Buffalo, Inc. v. Sedita, *supra*, are clearly distinguishable from the present case. In *Lankford*, the Court of Appeals for the Fourth Circuit issued an injunction against the Baltimore Police Department, barring its personnel from conducting searches of private dwellings solely on the basis of anonymous tips and hence without probable cause. And in *Sedita*, the Court of Appeals for the Second Circuit simply recognized that some form of injunctive relief might be issued if the plaintiffs could prove their allegations that the Buffalo city officials and the Buffalo Police Department had engaged in or condoned a systematic pattern of abusive conduct designed to deprive plaintiffs of their constitutional rights. The types of state action which were challenged in these cases were unlawful on their face;

neither type of conduct could have been justified under a valid exercise of discretion by state or city officials. Were any of the conduct challenged in the present complaint the type which could never be justified in the quelling of civil disorders, I am certain that injunctive relief should similarly be available to prevent its recurrence.

The conduct challenged in the present complaint, however, is not illegal and unjustified on its face. Rather, the legality ·of, and the justification for, the conduct challenged here necessarily rest upon the conditions which prevail at a given civil disorder. I can envision no form of injunctive relief which could properly predetermine the conditions of civil disorder under which speeches and assemblies shall and shall not be disrupted, arrests shall and shall not be made, and lethal and nonlethal force shall and shall not be employed.

I therefore believe that the District Court was powerless to issue any type of an injunction directed at the specific conduct of the Ohio National Guard which is challenged in the complaint. No less than an injunction prescribing prerequisites for the Governor's calling out the National Guard, an injunction forbidding or restricting the discretionary conduct challenged in the complaint would operate as an impermissible prior restraint on the state officials' judgment in the face of future civil disorders.

There thus being no injunctive relief which, in my opinion, the District Court could have granted in response to Appellants' second cause of action, only the declaratory judgment prayed for in the complaint remains to be considered. As discussed above in the context of injunctive relief, I believe the political question doctrine would similarly bar any form of declaratory judgment relating to the training and weaponry of the Ohio National Guard.

The only other conceivable form of declaratory judgment, apart from that re-lating to the training and weaponry of the National Guard, would be a judgment determining the legality of the specifically challenged conduct of the Ohio National Guard on the Kent State campus in May of 1970. I believe it is clear from the complaint, however, that the legality of the specific conduct of the National Guard troops on the Kent State campus in May of 1970 was not properly before the District Court as an "actual controversy" warranting a declaratory judgment under 28 U.S.C. § 2201. The thrust of the claim asserted in the complaint is the present threat which the continuing pattern of training, weaponry, and orders of the Ohio National Guard poses to Appellants' First and Fourteenth Amendment rights. Indeed, the complaint characterizes the Plaintiffs and other members of the class which they represent as students enrolled in Kent State University at the time the complaint was filed on October 15, 1970. Nowhere does the complaint allege that the named Plaintiffs or other members of the class were in fact the direct subjects of the alleged disruptions of speeches and assemblies, arrests, or use of nonlethal and lethal force in May of 1970 or that they were even enrolled in the University at the time of those disorders. Therefore, although the conduct of the National Guard in May of 1970 may have served as evidence of the alleged threat to Appellants' constitutional rights, I do not believe that it constituted a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" by the District Court under the present complaint. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

I thus am of the opinion that no conceivable form of injunctive or declaratory relief could have been granted by the District Court in response to the

**622**

claims asserted under the second cause of action. My conclusion is in no way altered by this Court's decision in Bright v. Nunn, 448 F.2d 245 (6th Cir. 1971). Although the plaintiffs in *Bright* sought declaratory and injunctive relief similar to that prayed for in the present complaint, it is apparent that the availability of relief was not considered in the *Bright* decision.

I also disagree with the majority's position that "[a] citizen complaint that state action *threatens* federally protected rights is, of course, cognizable in the federal courts . . ." (my emphasis). I believe this conclusion and the result reached thereunder ignore the numerous cases which clearly establish that a threat to, or "chilling effect" upon, a citizen's constitutional rights does not automatically constitute a justiciable case or controversy for the federal courts. As noted by the Court of Appeals for the District of Columbia Circuit, not "every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy." National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103, 1113–1114 (1969). Even those cases which have liberally recognized claims of a "chilling effect" appear to raise serious questions as to whether the alleged threat to Appellants' constitutional rights in the present case is cognizable as a justiciable case or controversy. *See, e. g.,* National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969); Tatum v. Laird, 444 F.2d 947 (D.C.Cir.1971). Compare Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Being of the opinion that no relief could be granted in response to the present complaint if it does indeed present a justiciable case or controversy, I find it unnecessary to resolve this more complex question.

For the reasons set forth above, I would affirm the District Court in its dismissal of all causes of action asserted in the complaint.