**Arthur KRAUSE et al.,
Plaintiffs-Appellants,**

v.

**James A. RHODES et al.,
Defendants-Appellees.**

No. 76–1095.

United States Court of Appeals,
Sixth Circuit.

Argued June 21, 1977.

Decided Sept. 12, 1977.

Rehearing and Rehearing En Banc Denied Oct. 20, 1977.

Certiorari Denied March 20, 1978.
See 98 S.Ct. 1488.

Clyde Ellis, Louis A. Jacobs, Michael E. Geltner, American Civil Liberties Foundation of Ohio, Inc., Columbus, Ohio, Sanford Jay Rosen, Rosen, Remcho & Henderson, San Francisco, Cal., Nelson G. Karl, American Civil Liberties Union Foundation of Ohio, Inc., Cleveland, Ohio, David E. Engdahl, Denver, Colo., Amitai Schwartz, Northern Cal. Police Practices Project, San Francisco, Cal., Robert P. App, American Civil Liberties Union of Ohio Foundation, Inc., Columbus, Ohio, Nicholas B. Waranoff, Jacobs, Sills & Coblentz, San Francisco, Cal., for plaintiffs-appellants.

William J. Brown, Atty. Gen. of Ohio, Richard A. Waltz, Columbus, Ohio, Burt J. Fulton, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, Charles E. Brown, Wm. W. Johnston, Crabbe, Brown, Jones, Potts & Schmidt, R. Brooke Alloway, N. Victor Goodman, Topper, Alloway, N. Victor Goodman, Goodman, DeLeone & Duffey, Columbus, Ohio, Robert W. Blakemore, Blakemore, Rosen & Norris, Timothy A. Shimko, Blakemore, Rosen & Norris, Robert W. Blakemore, Akron, Ohio, for defendants-appellees.

Before PHILLIPS, Chief Judge, and EDWARDS and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

In these consolidated cases damages were sought by nine persons injured and the personal representatives of four persons who were killed at Kent State University on May 4, 1970. The defendants were the Governor of Ohio, the president of the university and various officers and enlisted members of the Ohio National Guard. After a trial which lasted approximately 15 weeks the jury returned a verdict for all defendants and the plaintiffs have appealed.

This is the second appeal in the present case. In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court reversed this court's affirmance of a judgment dismissing the complaints on grounds that the defendants were entitled to immunity by reason of their official positions and that the Eleventh Amendment barred an action against the State of Ohio. The Supreme Court held that the complaints stated claims upon which relief may be granted and that the actions are not barred by the Eleventh Amendment. In its opinion the Supreme Court discussed the doctrine of executive immunity and its application in actions based on 42 U.S.C. § 1983 where it is claimed that state officials have misused power which they possess by reason of positions which clothe them with the authority of state law. In remanding the cases the Supreme Court defined the issues and the actions required of the trial court as follows:

> The documents properly before the District Court at this early pleading stage specifically placed in issue whether the Governor and his subordinate officers were acting within the scope of their duties under the Constitution and laws of Ohio; whether they acted within the

range of discretion permitted the holders of such office under Ohio law and whether they acted in good faith both in proclaiming an emergency and as to the actions taken to cope with the emergency so declared. Similarly, the complaints place directly in issue whether the lesser officers and enlisted personnel of the Guard acted in good-faith obedience to the orders of their superiors. Further proceedings, either by way of summary judgment or by trial on the merits, are required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint. 416 U.S. at 250, 94 S.Ct. at 1693.

These cases have been exhaustively briefed and they were fully argued. Though many specific errors are claimed by the plaintiffs, they may fairly be grouped into five categories: (1) lack of substantial evidence to support the verdict, (2) violation of First Amendment rights as a matter of law, (3) numerous errors in evidentiary and procedural rulings of the district court, (4) failure to deal properly with extraneous influences on the jury and (5) errors in the court's charge to the jury. We conclude that the plaintiffs are entitled to a new trial because the verdict was returned by a jury, at least one of whose members had been threatened and assaulted during the trial by a person interested in its outcome. The other contentions of the appellants will be dealt with only as necessary to avoid error at another trial.

### THE JURY ISSUE

The jury was not sequestered. Near the end of the trial it was reported to the district judge that one juror had been threatened three times and assaulted on one occasion. The threats were against both the juror and his family, and were related to the verdict in this case. The excerpts from the transcript which are appended hereto describe the problem and the steps taken by the district court.

Several facts require further comment. The district judge never interrogated the threatened juror to learn what effect the incidents had had on him and whether he had discussed the threats with other jurors. When counsel for the plaintiffs requested that such an interrogation take place the court indicated that he would "take care of it"—apparently referring to his tentative decision at that time to excuse the threatened juror. Later the court stated that there was no need even to inquire of the juror since he was going to be excused anyway. In fact, however, the juror was never excused. Instead the entire jury was informed that an attempt had been made to influence its decision in the case, and the jury was eventually sequestered. In addressing the jury the judge referred to the extreme seriousness of the threats and the fact that he had "blood on his hands" because of failure to take a threat seriously at some earlier time. The court did not question the other jurors to determine whether any of them had been approached or whether the threatened juror had discussed the details of his experience with them.

During the proceedings in chambers from which we have quoted extensively in the appendix the district judge indicated several times that he had decided to excuse the threatened juror. After the court had delivered its charge to the jury counsel for plaintiffs asked if the court had elected not to excuse the threatened juror. The following dialogue occurred:

> THE COURT: [4029] I am electing not to excuse that juror.
>
> MR. KELNER: I assume none of the parties know who that juror is?
>
> THE COURT: Not from me, I have refused very adamantly to give anybody the slightest hint.
>
> MR. KELNER: In relation to our responsibility to our clients, I think opposing counsel as well, are there any different facts available to the Court relating to the ability of this juror to fulfill his duties as a juror in deciding the case untrammeled by any further threats or any other details that we have not been provided with?
>
> THE COURT: No. The situation is no different than it was at the time the

matter was argued out. I simply took the position, after I reviewed the matter, there were many ways this man could react. He reacted in the proper manner, that is, called for help from the authorities that he could think at the moment for immediate help. If a fellow does that, that's an indication he is conscientiously trying to do the thing the right way.

I have a great belief in jurors and their ability to overcome [4030] any prejudicial things and to outweigh them when they know they have to do it.

I feel, even though he was approached and threatened something was going to happen, being assured that protection was forthcoming, he no longer has to consider that, and I am quite sure that he will be able to put these extraneous things out of his mind and decide the case on the basis of the law and the evidence.

I think it will be rather hard, in many ways, I think Mr. Fulton pointed this out, here is a guy who tried to do the right thing, after going through all the hell of this case, that automatically poisoned his mind and it wasn't his fault. I don't think it automatically poisoned anybody, so I am going to let him go.

[Page numbers refer to Joint Appendix.]

The Supreme Court laid down the following rule in *Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892):

> Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officers in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.

*Mattox* was a capital case. However, this rule has been applied in both criminal and civil cases through the years. It does nothing more than establish the most fundamental requirement for successful employment of the jury system—that every litigant may have confidence that his case will be decided solely on the law and the evidence heard in the courtroom. Since trial by jury is guaranteed in both criminal and civil cases by the Sixth and Seventh Amendments to the Constitution, any unauthorized intrusion into the work of a jury is a threat to our entire system of justice.

In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court criticized the use of an FBI agent to interrogate a juror who had been approached by a third party during a criminal trial, stating:

> The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate. *Id.* at 229–30, 74 S.Ct. at 451.

After remanding the *Remmer* case for a hearing on whether the incident was harmful to the defendant, the Supreme Court ultimately ordered a new trial upon concluding that the evidence ". . . reveals such a state of facts that neither Mr. Smith [the juror] nor anyone else could say that he was not affected in his freedom of action as a juror." *Remmer v. United States,* 350 U.S. 377, 381, 76 S.Ct. 425, 427, 100 L.Ed. 435 (1956).

█ It was established in *Remmer, supra,* 347 U.S. at 229, 74 S.Ct. 450, that, at least in criminal cases, any outside contact with a juror about a pending case made during trial, is "presumptively prejudicial," and that the burden of establishing harmlessness "rests heavily" on the government. This presumption has been consistently recognized by this court. In *Stone v. United States,* 113 F.2d 70 (6th Cir. 1940), a case which involved an attempt to bribe a juror, the trial judge first interrogated the juror who had been approached, in chambers with a court reporter recording the proceedings. He then asked the remaining jurors, individually and under oath, whether they had been approached or any unusual events had occurred in connection with their service on the jury. The first juror stated that he had told no one else of the approach, that as far as he knew no other juror had been ap-

proached and that he was "open minded" and able to decide the case as if he had not been approached. 'All the remaining jurors stated that they had not been contacted and that nothing unusual had occurred. Nevertheless, this court held that the presumption of prejudice had not been overcome since there was "no showing on the part of the appellee that no injury *could have occurred* by reason of the irregularity." *Id.* at 77–78 (emphasis added).

More recently we reached the same conclusion in *United States v. Ferguson,* 486 F.2d 968 (6th Cir. 1973), where the district judge made a commendable effort to avoid a mistrial. Referring to our earlier decision in *Stone, supra,* Judge William E. Miller wrote for the court.

> We reversed on the basis that once an improper communication has been made to a juror, there is a presumption that the rights of the defendant are prejudiced. *See Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). The burden was on the government to show that no prejudice resulted from the communication. Our insistence on this high standard was necessary, not only to insure that the defendant received a fair trial by impartial jurors, but also to maintain the integrity of the jury system. Inherent in our scheme of justice is the assumption that litigants will have faith in the probity of jury verdicts. Absent such faith the stability on which we depend for the orderly functioning of our legal institutions would be in doubt. *Id.* at 971.

■ The presumption that extraneous communications with jurors are prejudicial has also been applied in civil cases. In *Stiles v. Lawrie,* 211 F.2d 188 (6th Cir. 1954), the judgment in an F.E.L.A. case was reversed for a new trial because the jury considered material which had not been received in evidence. Applying a rebuttable presumption of prejudice the court found that it was impossible for the district judge or the court of appeals to know whether the extraneous material actually influenced the verdict. The test of harmlessness was stated as follows:

> Receiving incompetent documents by a jury requires that the verdict be set aside, unless entirely devoid of any proven influence *or probability of such influence* upon the jury's deliberations or verdict. *Id.* at 190 (emphasis added.)

A similar test was enunciated in a civil antitrust action where the district court had held a full hearing on an allegation of extraneous influences on a jury. The court of appeals in *Paramount Film Distributing Corp. v. Applebaum,* 217 F.2d 101, 105–06 (5th Cir. 1954), *cert. denied,* 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955), concluded:

> The solution of this question does not require a positive finding that the jury was actually influenced by what took place; but rather involves a determination as to whether or not it was made reasonably certain that they were not.

We can perceive no reason to apply a less rigid requirement to this case, where the extraneous influence consisted of threats on the life of a juror and his family, accompanied by a physical assault. The defendants' argument that there is no evidence that the jury was affected by fear or coercion misconceives the established law and ignores the presumption of prejudice. The record is completely barren of any showing that the verdict was not affected by an extremely serious extraneous intrusion. Under these circumstances, the party seeking to avoid a new trial has the burden of showing the entire absence of any influence on the verdict or the probability that such influence existed. *Stiles v. Lawrie, supra.* Counsel for the defendants objected to dismissing the threatened juror and made no request for a hearing which might have thrown further light on the circumstances of the threat and assault and its probable effect on the other jurors.

The cases relied upon by the defendants are readily distinguishable. *Womble v. J. C. Penney Co.,* 431 F.2d 985 (6th Cir. 1970), did not involve an extraneous influence. This was a specific finding of the district court, affirmed by the court of appeals. Under the circumstances of that case there

was no abuse of discretion in denying a motion for a new trial. In *Gault v. Poor Sisters of St. Frances,* 375 F.2d 539, 551 (6th Cir. 1967), the court concluded that there was no showing of "extraneous influences brought into the jury room from outside [citing *Mattox, supra*] . . . or any improper approach to or communication with the jury prior to or during the course of its deliberations by some outsider." Similarly, in *Stephens v. City of Dayton,* 474 F.2d 997 (6th Cir. 1973), there was a finding of no extraneous influences. Obviously none of these cases provides guidance in the present case, where a most serious extraneous influence was brought to bear on at least one juror. This case is controlled, rather, by the doctrine of *Mattox v. United States, supra,* as applied by this court in civil as well as criminal cases.

The defendants argue that the plaintiffs did not object to the district court's decision to permit the threatened juror to remain on the jury. An examination of the transcript makes it clear that counsel for the plaintiffs repeatedly requested that the threatened juror be excused. Rule 46, Fed.R.Civ.P. provides:

### Rule 46.
### EXCEPTIONS UNNECESSARY

Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.

The transcript reveals that the district judge knew that the plaintiffs had requested that the threatened juror be excused. Furthermore, the trial judge repeatedly indicated that the juror would be excused, and that there would be no point in questioning since he could not be permitted to participate in the deliberations.

Every litigant is entitled to a verdict which is free of improper influences. It was error for the trial court to determine *ex parte* and without any personal interrogation that a juror who had been threatened and assaulted and told that his home would be blown up could continue to serve, unaffected by these incidents. The threatened juror should have been questioned by the court to hear his version of the reported incidents and to learn whether he had discussed them with other jurors, including the possibility that he had disclosed the way in which his assailant was attempting to cause him to vote. Unless counsel agreed to an *in camera* interrogation, they were entitled to be present and a record should have been made of the proceedings. *Remmer v. United States, supra,* 374 U.S. at 229–30, 74 S.Ct. 450; *United States v. Gay,* 522 F.2d 429, 435 (6th Cir. 1975). Unless the court was completely satisfied after questioning him that there was no probability that the threatened juror would be affected in the performance of his duties that juror should have been excused. As the court stated in *Stone v. United States, supra,* 113 F.2d at 77, "If a single juror is improperly influenced the verdict is as unfair as if all were." Further, if it appeared that any other jurors had been subjected indirectly to improper influences by reason of their knowledge of the threatened juror's experience the district court would be required to consider declaring a mistrial, lamentable as that would be. See *Briggs v. United States,* 221 F.2d 636, 639 (6th Cir. 1955). Here no attempt was made to determine whether the remainder of the panel had possibly been contaminated. Instead, they were merely told that efforts had been made to influence one of their number, with alarming references to the extreme seriousness of the threats, and were left to speculate about the entire matter.

We have considered the possibility of remanding for a hearing on the question of whether the unlawful intrusion in this case was harmless, but have concluded that such a hearing would be pointless. If the threatened juror had been questioned im-

mediately after the court was informed of the intrusion the district court might have been able to determine the extent of the probable influence of the incident on him, and acted accordingly. Likewise, if the remaining jurors had been questioned at that time, a basis would have existed for deciding whether they would probably be influenced. Even when the investigation is made immediately upon learning of an intrusion it is extremely difficult to learn the extent of the extraneous influence upon a jury. This difficulty is compounded if questioning is deferred, since it is not clear that a juror can be questioned after verdict except to determine whether an intrusion has occurred. The courts have not ruled uniformly on the question of whether a juror may be interrogated after a verdict is rendered as to the effect of extraneous influences on him. See *e. g., United States v. Remmer,* 122 F.Supp. 673, 675, n. 4 (D.Nev. 1954); *cf. United States v. Barfield,* 359 F.2d 120, 123 (5th Cir. 1966). This matter is not settled by Rule 606, Fed.R.Ev., since testimony concerning outside influences is treated as an exception to the general rule against a juror impeaching his verdict.

Even if questioning the jurors were permitted on the issue of whether the verdict was affected by the incidents, considering the problem of fading memories and natural reluctance of a juror to admit that he had been improperly influenced, we believe it would be impossible now for either the district judge or this court to conclude that the threat and assault disclosed by this record were harmless. *Cf. Stiles v. Lawrie, supra,* 211 F.2d at 190.

The intrusion in this case represents an attempt to pervert our system of justice at its very heart. No litigant should be required to accept the verdict of a jury which has been subjected to such an intrusion in the absence of a hearing and determination that no probability exists that the jury's deliberations or verdict would be affected. Although we are reluctant to do so, particularly in face of the obvious good faith ef-

forts of the trial judge to deal with a most difficult problem which arose near the conclusion of an exhausting trial, we conclude that reversal for a new trial is required.

## FIRST AMENDMENT CLAIMS

The plaintiffs contend that they were entitled to a directed verdict on their claim that the banning and dispersal of the assembly on the Kent State campus at noon on May 4, 1970 violated the right of peaceable assembly. In opening statements to the jury and in colloquy with the district court and opposing counsel it was admitted by attorneys for the plaintiffs that there had been violent assemblies in Kent and on the campus of Kent State on Friday, Saturday and Sunday nights, May 1, 2 and 3. Counsel conceded that Governor Rhodes had the right to call in the National Guard "because of the violence which had occurred, because it was unexcusable [sic], unjustifiable . . . ." It is admitted in the brief of the plaintiffs that students and other young people engaged in violence and vandalism in Kent, Ohio and on the campus during the three preceding days. On Saturday May 2nd the crowd burned the ROTC building on the campus and interfered with officers and firemen who attempted to control the fire. On Sunday May 3rd a crowd on the campus became disorderly and attempted to attack the university president's home. This crowd was finally dispersed by the National Guard after it had left the campus and caused further damage in downtown Kent. Policemen, firemen and national guardsmen were repeatedly assaulted while attempting to maintain and restore order during the three-day period.

It is settled that violent demonstrations do not enjoy First Amendment protection. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Nevertheless the plaintiffs contend that an order banning the noon assembly on the campus on May 4, 1970, and attempts to disperse * that assembly before any violence

---

* The actual orders to disperse the May 4th assembly were relayed to the crowd by a Kent

State security officer, not by anyone connected with the National Guard. This officer rode

occurred constitute a deprivation of their constitutional right to free expression which is distinct from their right not to be deprived of life or liberty without due process of law.

■ The plaintiffs' argument is based upon the faulty premise that the authorities had nó right to ban or disperse the May 4 assembly in advance even though it was uncontradicted that similar group meetings in Kent, Ohio and on the campus of Kent State during the preceding three days had resulted in widespread violence and property damage. In their view "prior restraint" is never justified, and the authorities must always indulge the presumption that the next assembly will be peaceful, no matter how violent the preceding ones have been. That is not the law, particularly in a school or college setting. *Norton v. Discipline Committee of East Tennessee State University*, 419 F.2d 195, 199 (6th Cir. 1969), *cert. denied*, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970); *Butts v. Dallas Independent School District*, 436 F.2d 728, 731 (5th Cir. 1971).

■ The "clear and present danger" test for restricting freedom of expression or association is met when expression is directed to "inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). While confirming the right of students to the freedom of expression guaranteed by the First Amendment, the Supreme Court in *Tinker v. Des Moines School District*, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), noted this limitation:

> But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. (citation omitted).

The Court elaborated on *Brandenburg* and *Tinker* in *Healy v. James*, 408 U.S. 169, 188–89, 92 S.Ct. 2338, 2350, 33 L.Ed.2d 266 (1972), as follows:

> The critical line heretofore drawn for determining the permissibility of regulation is the line between mere advocacy and advocacy "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, [89 S.Ct. 1827, 23 L.Ed.2d 430] (1969) (unanimous *per curiam opinion*). See also *Scales v. United States*, 367 U.S., [203] at 230–232, [81 S.Ct. 1469, 6 L.Ed.2d 782]; *Noto v. United States*, 367 U.S. 290, 298, [81 S.Ct. 1517, 6 L.Ed.2d 836] (1961); *Yates v. United States*, 354 U.S. 298, [77 S.Ct. 1064, 1 L.Ed.2d 1356] (1957). In the context of the "special characteristics of the school environment," the power of the government to prohibit "lawless action" is not limited to acts of a criminal nature. Also prohibitable are actions which "materially and substantially disrupt the work and discipline of the school." *Tinker v. Des Moines Independent School District*, 393 U.S. at 513, [89 S.Ct. 733]. Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education. (footnote omitted).

We conclude from the uncontradicted evidence of three successive days of violence involving students and other young people that the defendants satisfied the "heavy burden" of justifying their decision to permit no assemblies on the Kent State campus on May 4, 1970. *Healy v. James, supra*, 408 U.S. at 184, 92 S.Ct. 2338.

The defendants made a motion for directed verdict on all issues at the conclusion of the plaintiffs' proof, and renewed it at the conclusion of all proof. In view of the uncontradicted evidence that violence accompanied assemblies of students and

---

back and forth in a jeep in the area where the crowd had gathered and ordered the dispersal, using a bullhorn. Rocks were immediately thrown from the crowd, at least one hitting the officer, and threats and obscenities were shouted at him.

young people for three consecutive days in Kent and on the campus, finally subsiding at about 3:00 a. m. on May 4th the order banning assemblies on that day did not violate the First Amendment. *Bright v. Nunn,* 448 F.2d 245, 249 (6th Cir. 1971). The motion for directed verdict on the separate claims for damages for violation of the right of peaceable assembly should have been granted. Upon another trial this claim will not be an issue.

■ The defendant White, president of Kent State, had no control over the actions of the National Guard. Since his participation in the decision to ban the May 4 assembly did not violate rights of the plaintiffs, there is no theory under which he could have been liable to the plaintiffs. Upon remand the district court will dismiss all claims against this defendant.

## INSTRUCTIONS

Upon retrial the evidence and the issues presented may differ from those of the first trial. For this reason the plaintiffs' arguments concerning the jury charge at the first trial will not be considered in detail. However, we call attention to several questions which are likely to be raised concerning instructions at the second trial in order that error may be avoided.

■ One aspect of the district court's charge appears to conflict with a recent Supreme Court ruling. In the present cases the court instructed the jury that it could find for the plaintiffs under their § 1983 claim if the action of the defendants constituted cruel and unusual punishment as proscribed by the Eighth Amendment. In *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Court held that the Eighth Amendment was designed to protect those convicted of crimes. Where a state seeks to punish without an adjudication of guilt, "the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.* at 672, n. 40, 97 S.Ct. at 1413. Upon another trial separate instructions on cruel and unusual punishment should not be given.

■ The defendants contend that no issues related to "training, weaponry and orders of the Ohio National Guard" should have been submitted to the jury. This argument is based on the Supreme Court's decision in *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), where questions related to deployment of the Ohio National Guard at Kent State were held to present non-justiciable issues in an action seeking a declaratory judgment and injunction. In *Scheuer v. Rhodes, supra,* the Court noted the limited holding of that case in the following language:

> *Gilligan v. Morgan,* by no means indicates a contrary result. Indeed, there we specifically noted that we neither held nor implied "that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief." 413 U.S., at 11–12, [93 S.Ct. 2440.] (Footnote omitted.) 416 U.S. at 249, 94 S.Ct. at 1693.

Article I, § 8, cl. 16 of the Constitution grants to Congress authority "[t]o provide for organizing, arming, and disciplining . . . ." the militia and reserves to the states the appointment of officers and authority for training the militia "according to the discipline prescribed by Congress." The Department of the Army, by delegation from Congress, has prescribed rules and regulations pertaining to training, weaponry and orders of the National Guard. There was voluminous evidence in this case from which a comparison could be made between the procedures prescribed by Congress and those ordered and practiced by the Ohio National Guard. It was for the jury to determine whether the Ohio orders and regulations, particularly with respect to use of loaded weapons in dealing with civil disturbances, represented a departure from Army regulations. If such a departure was found to exist, it was a factor to be considered in deciding the ultimate issues of liability in these cases. A justiciable controversy related to training, weaponry and orders was presented.

We have examined the entire charge to the jury and are impressed with the apparent effort of the district court to arrange the issues logically and to present them with clarity. The plaintiffs contend that the charge was "incredibly long and complex." The length and complexity of the instructions resulted, at least in part, from the fact that the plaintiffs sought damages under several different theories, requiring the court to state the law applicable to each claim separately with regard to each legal theory. The plaintiffs made an eleventh-hour motion to dismiss the pendent state claims with prejudice. Since proof had been completed and the court had distributed proposed instructions which included law related to the pendent claims, this motion was denied. If such a motion is timely made upon remand, the length and complexity of the instructions will be materially reduced.

Numerous specific requests for instructions were covered in the district court's charge, though not in the precise form or language requested. The court is not required to adopt the language of the requesting party if the substance of the requested charges is contained in the instructions actually given. *Womble v. J. C. Penney Co., supra*, 431 F.2d at 988. At the next trial the court will reexamine all requests for instructions in light of the proceedings before it and controlling authority.

## OTHER ISSUES

There was sharp conflict in the evidence concerning events after the National Guard began its efforts to disperse the May 4th noon assembly. Neither the plaintiffs nor the defendants were entitled to a directed verdict on the due process and pendent state claims. Jury issues were presented and it cannot be said that the verdict was not supported by substantial evidence. This is not to intimate any conclusion if a similar contention is raised at the second trial, as the evidence may be materially different.

It is unlikely that the alleged trial errors will occur at another trial. Many questions will be controlled by the Federal Rules of Evidence, which became effective midway through the first trial. The applicability of the Rules will doubtless eliminate some of the controversies over trial rulings which marked the earlier proceedings.

These cases essentially present the question of whether excessive force was employed in attempting to deal with a civil disturbance. Both the due process claims and the pendent state claims are concerned with the basic issue of the appropriateness of the response of state officials and National Guard members to the conditions which existed and developed at the May 4th noon assembly on the Kent State campus. The tragic results of that confrontation are well known. The question of legal liability must still be resolved. With the First and Eighth Amendment claims eliminated the second trial will focus on the decisive issues related to the due process requirements of the Fourteenth Amendment and substantive law of Ohio. That trial should be less complicated and should present more clearly defined issues than the first.

The judgment of the district court is reversed and the consolidated cases are remanded for a new trial consistent with this decision. The plaintiffs will recover their costs on appeal from the defendants other than Robert White. The district court will enter an order dismissing all claims against the defendant Robert White, who will recover his costs on appeal from the plaintiffs.

## APPENDIX TO OPINION

[3684]

### MORNING SESSION
Wednesday, August 20, 1975
9:13 o'clock a. m.

(THEREUPON, the following proceedings were had in chambers, in the presence of the Court, counsel for the respective parties, and also present were Robert G. Wagner, United States Marshal, and Frederick M. Coleman, United States Attorney:)

THE COURT: . . . [3686] I find that at least one of the jurors has been

approached on several occasions and threatened and actually physically assaulted in connection with the threats; threats have been made on his family, if he doesn't bring in a verdict in a certain way.

Now, I think there is still some possibility that, at the present time—this came to a head late last night and since then the Marshal's service has put the man under guard, the FBI is launching an investigation, and we have some hopes, according to Mr. Coleman, that if we can keep this thing quiet enough that the offense may be repeated, and if it were, with the juror under proper surveillance, the offenders can be apprehended. . . .

[3687] . . . I certainly don't want anything that we do to hamper their efforts, because there is nothing more damaging to the justice system than to have people be able to attack the integrity of the judicial process, which is what has been done here.

Now, the thing that is bothersome about this, that we can't solve that problem just by excusing that one juror. The difficulty with doing that is, if these people are really serious, then they will shift their attention to some of the other jurors. We have no way of knowing that they have put out some feelers to the other jurors, but the other jurors may have not attached any significance to the preliminary approaches. This juror didn't pay attention the first time, it was only when repeated attempts were made and physical assaults were made on him that he thought there was something serious here and reported it to the authorities.

It appears to the United States Attorney and to me that under these circumstances, for the protection of the jurors, I don't [3688] have too much choice but to sequester them, because we don't have enough manpower locally to put all these jurors under guard and their families under guard. So that the only thing we can do is to sequester the jury.

Now, that sequestration of a jury is a serious business and I don't want to do that unless counsel feel that that's the only

thing we can do. . . . [C]ertainly we need all to discuss that matter and reach some consensus about it. . . .

\* \* \* \* \* \*

THE COURT: This is the first moment anybody has heard about it. I have only been aware of it for about a half hour.

\* \* \* \* \* \*

MR. KELNER [3690] [for plaintiffs]: . . . Coming back to this matter, Your Honor, may we know anything about the nature of the assault?

The reason I am asking it, sir—

THE COURT: No. The assault consisted that a person who approached this juror and made three approaches to him, on one of those approaches he grabbed the juror and pushed him back against the wall and told him that he better not find his verdict the wrong way from the way he wanted it to be found.

\* \* \* \* \* \*

MR. KELNER: [3692] There is one more point I would like to raise, your Honor, and I am happy I don't know what the person who wanted this juror to vote one way or another, I'm glad I don't know which way it is meant.

Is it possible that that juror, with the normal human impulse to react against one who threatens him and assaults him, would tend to bend over backwards to vote the other way?

In that event, could that juror be properly interrogated by your Honor in the privacy of your chambers in order, perhaps, that would sway him on the proper deliberation from all of the evidence in view of the experience he has had?

I am concerned about that. . . . I don't care whether this juror is for me or against me. If he feels he has been swayed, I want him off.

\* \* \* \* \* \*

THE COURT: [3695] At any rate, gentlemen, we are getting away from the problem with which I am primarily concerned.

The question of the effect on this juror is one that I can address myself to later on. That is not too consequential because we still have two alternates.

The thing that I am concerned with is what we are going to do to protect the rest of the jury.

\*　　\*　　\*　　\*　　\*　　\*

MR. BROWN [for defendants]: First of all, I assume the Court asked the juror not to discuss this with other jurors, to get them unduly alarmed? [3696]

THE COURT: I haven't spoken to the juror. The Marshal and I think FBI people are speaking to him and I assume they have asked him not to talk about it.

Is that right, Mr. Marshal Wagner?

MARSHAL WAGNER: Yes, sir. That was your desire and I relayed that information to the man.

MR. BROWN: Secondly, I think on the question of sequestration, the Court and counsel should look at what effect this threat had on this man. Obviously it had enough effect that he reported it to the Marshal, the Court or whoever he reported it to.

My basic philosophy is, frankly, that of the Court's. I am opposed to sequestration.

To me, it gives kind of a forced aura to deliberations and I don't like that.

Now, if it is a real, if any juror is in real danger, of course, I would certainly modify my position on that but, if not, I would be opposed to sequestration. [3697]

THE COURT: Well, I, of course, take the position that telephone threats may be one thing, but threats that are communicated face to face—I was trained in the idea that you do not ever take lightly a face-to-face threat.

If a fellow says he is going to kill somebody or somebody is going to kill him—there's at least one person dead because I didn't take such a threat as seriously as that.

MR. BROWN: Was this a death threat to this juror?

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Yes.

MR. BROWN: I did not know that.

\*　　\*　　\*　　\*　　\*　　\*

MARSHAL WAGNER: Threatened to blow up the house.

\*　　\*　　\*　　\*　　\*　　\*

MR. KELNER: Now, Judge, I would like to know whether you would interrogate this [3698] juror to determine what if any effect this has on his ability to be fair-minded, in view of the fact that the obvious impulse would be for him to lean over backwards against the side that was trying to threaten him?

THE COURT: As I just said, Mr. Kelner, that is a matter that I will take care of and can take care of very easily. That isn't what is concerning and troubling me now.

What I am concerned now about is physically protecting the rest of the jury and physically protecting the integrity of this trial, throughout the remainder of it, and that's the thing that is, frankly, worrying me.

MR. ALLOWAY [for defendants]: Your Honor, I have shifted my thinking a couple of times during the course of this conference, and it just shifted away again. . . I think if it is a threat as to blowing up a juror's house, the juror isn't going to feel very comfortable at being sequestered while his family is posed with the threat, and I would assume that sequestration [3699] isn't going to solve the problem.

. . . I don't think that sequestration is in any way necessary—to insure a fair and impartial verdict, as far as—

THE COURT: I don't think that is—I agree with you on that. I don't think—that is not what I am worrying about.

MR. ALLOWAY: [3700] I also don't think it is going to help as far as the threats to the jurors are concerned.

If they are threatening to blow up their houses, that is something entirely different and this isn't solved by sequestration.

MR. BLAKEMORE [for defendant White]: . . . I think the test should be that when in doubt you sequester. . . .

MR. ENGDAHL [for plaintiffs]: . . . I think it would be helpful for the rest of us if this is perfectly clear, that we have your specific order that we are not to discuss this matter in the presence of, the existence of this threat, with anyone, including our clients outside this room; is that correct?

THE COURT: That is right. That [3701] is right. Not even with your clients.

\* \* \* \* \* \*

MR. ENGDAHL: And secondly, it does seem to me that the fact that one threat apparently has been made means that we are concerned not only with the particular substance of that one threat but the possibility of threats communicated to other jurors, and that is a risk that I think nothing but sequestration can deal with.

True, this one person may be better at home protecting their house, but that would leave everyone available to any other type of threat, which apparently seems to be a serious risk.

THE COURT: Yes. As I say, it is easy enough to solve the problem of that juror. I could just, I could simply discharge him, and probably in view of all of the circumstances I should, without regard to anything else, but the thing that has disturbed me about that is that once he is gone so that the people who have threatened realize that they have accomplished nothing by that one, if they are as rough as [3702] they have shown themselves to be, are they going to stop there or are they going to go on? Are they going to go on then and pick the next one? That is the thing that I am concerned about and that is why I have turned my thoughts very reluctantly to the matter of a possible sequestration of the jury.

MR. BROWN: Just, Judge, to help me in my thinking, is the threat or threats by one person or by more than one person?

THE COURT: Marshal Wagner, you have more information on that than I do, and can you tell them what you told me about this matter so that counsel can hear what you said about your investigation on it so far?

MARSHAL WAGNER: So far, we do believe there is a witness to the actual assault. Man approached three different times in one day.

MR. BROWN: By one person?

MARSHAL WAGNER: By one person.

MR. BROWN: Well, that isn't quite as bad. Oh, it's bad—

\* \* \* \* \* \*

MR. BROWN: [3703] Were the threats here in the area of the Courthouse or elsewhere?

MARSHAL WAGNER: One, in the area of the Courthouse.

MR. MANDEL [for plaintiffs]: If your Honor please, may I ask Mr. Coleman if he has contacted the FBI and instructed them to make an immediate investigation?

\* \* \* \* \* \*

MR. COLEMAN: Okay. The information, Mr. Mandel, came first to my attention last night.

The facts with respect to the approach to the juror that I received from the agent are not as voluminous as those which Mr. Marshal [3704] has offered us. The agent, when he called me, had done nothing more than talk to this individual, the juror, who called him, and, of course, he was able to make a very limited interview over the telephone.

However, he did learn enough to know that the juror had been approached on two different occasions and he brought it to my attention.

\* \* \* \* \* \*

THE COURT: [3706] . . . I have reached a tentative conclusion that it would be very difficult and also extremely hard on the jurors to put on an immediate order of sequestration.

So that I propose to discuss with the jurors, with counsel present of course, but in the absence of all the public, that they should make preparations so that when

they come back tomorrow morning they will have clothing and toothbrushes and things sufficient for some time and make their necessary family arrangements, and ask them to do that with the utmost of discretion in warning their families.

It is necessary not to tell anybody about this, because as long as they aren't sequestered they are available for threats or action.

[3707] Once we get them in and manage to keep this properly confidential, if we get them in sequestration, then, of course, they are safe. There is no use of making or carrying out threats if they are not going to be able to affect a juror, which they won't be once the jury is sequestered.

MR. KELNER: . . . Are you going to proceed on the assumption that they already know about the threats to that one juror?

I assume they already know about it. Are you going to assume they don't know about the threats, or are you going to discuss the subject of one juror being threatened?

THE COURT: If we reach the conclusion about going into sequestration, I am certainly going to tell the jury the reason why. Otherwise, the jurors might have uncharitable thoughts about it, which wouldn't help them in reaching a fair verdict. I want them to be sure that they understand that I am doing this not because counsel or I don't trust them, but because it appears to me to be essential for their own safety. [3708]

MR. KELNER: I think I would oppose that, Your Honor, for this reason.

I am thinking that might instill a sense of fear in the jury, and following the logic of it, we don't know which side was the subject of being favored by the threats, I think it might instill resentment in the entire jury, whoever threatened that juror wanting to threaten them one way might want the jury to think the other.

MR. BROWN: I am diametrically opposed to Mr. Kelner.

MR. KELNER: I have no way of knowing whether the juror favored one or the other. I don't want to guess at it.

I think, sir, that would certainly cause such a deep resentment, because of the inconvenience that it would be instilling something more powerful than any 10 witnesses that testified in this case.

\* \* \* \* \* \*

MR. BROWN: [3709] I have always been raised that candor is the best way out.

I think the Court can handle this very nicely. He doesn't have to overemphasize the nature of the threats. I would play it down, frankly, if I were the Court.

THE COURT: I am going to.

MR. BROWN: Just to tell the jury that they are being sequestered to insure nobody would be contacted, the Court and counsel have decided it would be best to sequester them.

MR. KELNER: I would offer an alternative proposal for you to consider, Your Honor.

I would offer the suggestion that the jury be told that we are at the conclusion of a very lengthy case with the many factors in it and in the Court's discretion and the Court's judgment, the jury be sequestered.

In many important criminal trials they are sequestered from the first day of the trial. I would be opposed to any discussion of the threats. It is going to magnify it. It may cause fears of retribution concerning their verdict after they go home, after [3710] they are discharged.

I say this is going to infect this jury with an untangible [sic] factor that either side can't measure.

I don't think it should be of any discussion, the whole threat business.

\* \* \* \* \* \*

MR. KELNER: [3712] Judge, I'm opposed to that for the reason it is going to infect this entire jury with something that will preoccupy their minds; fears of threats, fears of retribution. It is going to be the subject of gossip in the jury room. They are human, what else are they going to talk about. . . .

I say, sir, this is going to be a mistake to tell them about the very serious threats about the possibility of danger to their families and their homes.

Your Honor, I think you can take very strong control of this matter by stating to the jury: Now that this case is nearing the end and there are many important factors for you to consider, we are going to sequester you.

I would take exception to anything else that is going to take over the minds of the jury with a factor that is going to be impossible for them to overcome.

The threats are going to be half of the [3713] factors in the scales when they go in to decide this case.

MR. BROWN: . . . I think we have 14 intelligent people up there who will do exactly what the Judge tells them. If you don't have that belief in the jury system, let's abandon the whole thing.

\* \* \* \* \* \*

THE COURT: . . . [3716] [W]hat I'm going to do, with tremendous reluctance, I am going to sequester this jury and I am going to tell the jury exactly why I am sequestering them.

And I am going to let the chips fall where they may.

With respect to the one juror who has been the object of this matter, I feel that under all of the circumstances that it will be necessary to replace him with an alternate juror for deliberation and that will make him available to you, to the Government, for cooperation.

I shan't advise him of that, however, until I send the jury in to deliberate. In other words, in [sic] order that he is being excused at this stage of the game would raise a lot of questions. If the jury appears to be in exactly the same shape and composition as it has been all the way along, that will certainly leave things so that the cooperation you will have, your agents will have a better opportunity to see if they can apprehend the people who [3717] approached him.

\* \* \* \* \* \*

THE COURT: . . . [B]ut for the sake of the integrity of the record, I think I am going to have to excuse him. There is no use of my even inquiring about it, I am just going to have to excuse him when the jury gets ready to deliberate.

MR. BROWN: [3718] Let me take exception to that and state my reasons.

I am opposed to it because I do not feel that the Court has sufficient information that this would or this would not influence his verdict.

More importantly, if it happened once it can easily happen again. . . .

And this has concerned me throughout this trial with only four alternates. . . Assume we wound up with 11 jurors, then what?

THE COURT: Again, I will cross that bridge when I come to it. . . .

MR. KELNER: [3719] . . . You say you are allowing this juror, who will be excused, to remain until the end of the prooftaking or the end of the summation or just what?

THE COURT: When I am ready to send the jury out to deliberate, at that point he will be let off. Otherwise, the jury will appear just as it has been appearing. No one from the outside will know that he is not going to be going in . . .

\* \* \* \* \* \*

THE COURT: [3720] . . . I am not even going to tell him.

MR. FULTON [for defendants]: If the Court please, I want to join in an exception, because I know of no rule of law that says that merely because someone has received a threat, there have been threats against jurors, that this makes him incapable of being a juror.

We have already lost two jurors in this trial since the start. . . .

\* \* \* \* \* \*

MR. FULTON: . . . There could well be other threats against other jurors and they have not come forward, just as I am sure there have been other threats

against other people in this case who have kept silent and said nothing about it.

. . . [3721] [H]e . . . is being penalized for a purported threat against him when he, himself, has done the very thing we would expect a juror to do if this system is going to work.

. . . [H]ere is a man who says, "I have been threatened, I am willing to tell you the truth, I am here as a juror. Now what happens to me? I am penalized because I have the guts to come forward and say what has happened."

THE COURT: Well, Mr. Fulton, you have raised some thoughts that I hadn't had.

At any rate, since I don't intend to do anything about this matter for at least two days, the only thing I will say at the present time [3722] is that my decision to sequester is made.

As to what I will do about the particular juror who was threatened, I may, after I have had a chance to give further consideration to the arguments of counsel both pro and con, I will decide whether or not I will let him go in with the jury to deliberate.

MR. BROWN: I certainly endorse everything that Mr. Fulton said.

MR. ALLOWAY: May I express myself as supporting Mr. Fulton?

MR. KELNER: I will take exception to the entire threat situation being disclosed to the entire panel.

[Page numbers refer to Joint Appendix]

EDWARDS, Circuit Judge, concurring.

I join fully in Judge Lively's opinion for the court.

However, I also find reversible error in the District Judge's comments to the jury pertaining to the threat to the one juror. It is hard to see how the jury as a whole could fail to feel threatened by the comments made to the jury from the bench. Granting the difficulties of the situation, the language the District Judge employed simply went too far.

In notifying the jury of his intention to sequester them, the District Judge said:

I am very much troubled and disturbed by information that has come to my ears that threats have been made to at least one of your number in an attempt to influence your decision in this case.

I was brought up in an old school that threats of the type that were made are not to be ignored and not to be taken lightly.

There have been times when I have ignored such threats and I have blood on my hands and it is not easy to carry blood on your hands for ignoring things, and I don't propose to have it happen again if I can avoid it.

What I am now saying to you, I must ask you to keep in the very strictest of confidence. You can't keep it in absolute confidence because you are going to have to go home and discuss it with your families at a later point today. But when you do discuss it with them, I think you must emphasize to them that it is of vital importance to them that they do not breathe a word of what you tell them to anybody, under any circumstances whatever.

What I am going to have to do, and I do this with tremendous reluctance, I am going to have to arrange, when you come back tomorrow, for you to bring clothing and things so that you can stay and be under the protection of my Marshals and stay together until this case is finally concluded.

How long that will be, I don't know, because it is going to take you a long time, I realize, for your deliberations.

But you are going to have to stay and stay under my custody and be kept away entirely from the public until you have reached your decision in the case.

I am sorry about this, but as I say, threats have been made on the lives of one of your number and I have no assurance that we can solve it simply by getting rid of that one.

Maybe some of you others have been threatened and have passed it off or have not even realized, perhaps, it was a threat

or an attempt to threaten. But obviously threats become idle once they can no longer be communicated to you.

In other words, there is no need, you can't make a threat if you can't get it through to the person that you expect to be influenced by it. And it is for that reason only that I am taking this step.

I had thought that I would never, under any circumstances, reach a point where I felt that a jury ought to be sequestered. You read it in the paper, it is done very frequently, particularly in criminal trials of great magnitude. I have always felt that, to a considerable extent, an insult to the integrity of the jurors.

I am not now dealing with a matter of your integrity, which I have no doubts about whatever. But I am dealing with threats, as I say, my experience leads me to believe that I ought not simply ignore.

And it is your safety with which I am concerned, not your integrity. I don't worry about your internal integrity, that I have confidence in. I know you can protect that. But I don't have enough Marshals and enough FBI people, agents, to keep you protected as you go about your daily business.

Now, the reason I am not saying that you have got to stay right here and now be under protection now, I think if you do follow my instructions not to breathe a hint of this to anybody, as I say, you will have to tell your families because you will have to make arrangements for them to be taken care of, and that sort of thing while you are staying as my unwilling guests. But if we ostensibly go through the same motions that we have been going through, I think that the threateners, whoever they are, will not change their tactics. They will continue to concentrate where they have been concentrating.

As to one of your members, at least, we can provide and will provide around-the-clock protection and surveillance and as a practical matter, also of law enforcement in making such threats, of course, it is a very serious crime.

But people can't be punished for crime unless they can be apprehended, and one of the hardest things in the world is to apprehend stinking cowards who go around making and carrying out threats.

## ORDER

The petitions for rehearing with suggestions of rehearing en banc filed by the defendants-appellees having come on for consideration, and of the Judges of this court who are in regular active service less than a majority having favored ordering consideration en banc (Judges Weick, Celebrezze and Peck favored rehearing en banc and Judge Weick has filed a separate dissent), the petitions for rehearing have been referred to the hearing panel.

Upon consideration of the petitions for rehearing the court concludes that the issues raised therein were fully considered upon submission and decision of the case.

Accordingly, the petitions for rehearing are denied.

WEICK, Circuit Judge, dissenting.

Three of the seven active Judges of this Court, namely Circuit Judges Celebrezze, Peck and Weick, voted in favor of an en banc consideration. Only one Judge in addition to the three-Judge panel, voted against en banc consideration.

This is one of the most important cases ever to come before this Court for determination. It surely merited en banc consideration. It involved *inter alia* the question of the individual liability of the State of Ohio's Chief Executive Officer, the Governor of the State, for damages resulting from his calling out the Ohio National Guard, at the request of the Mayor of the city of Kent, to suppress a riot occurring on the campus of Kent State University, during the continuance of which riot the R.O.T.C. building on the campus was destroyed by fire, and stores in the city of Kent were looted by the mob. The rioting, looting, and arson constituted felonies under Ohio law. Ohio Rev. Code §§ 2917.02, 2917.03, 2911.01, 2911.02, 2909.02, and 2909.13.

The jury returned a verdict in favor of all the defendants after a trial which lasted nearly four months, which defendants included all of the members of the Ohio National Guard, the Governor of Ohio, and the President of Kent State University.

A panel of this Court has reversed on the sole ground of alleged threats against and assault upon one of the jurors in the case.

It is the Governor's contention that the District Court erred in denying motions for a directed verdict which were made by him at the close of plaintiffs' evidence and renewed at the close of all of the evidence. As will be shown below, the Governor was entitled to a directed verdict.

Since the Governor was entitled as a matter of law to the direction of a verdict in his favor, any other errors of law occurring at the trial are harmless. The panel recognized this proposition of law when it held that a verdict should have been directed in favor of the President of Kent State University and entered judgment in his favor. The suit against the President of Kent State University was plainly frivolous. The supporting authorities for harmless error are:

Rule 61 Fed.R.Civ.P.

*Prebble v. Brodrick,* 535 F.2d 605 (10th Cir. 1976).

*L. & S. Enterprises v. Great American Ins. Co.,* 454 F.2d 457 (7th Cir. 1971).

*Quick v. American Steel & Pump Corp.,* 397 F.2d 561 (2d Cir. 1968).

The Governor was requested, by proclamation of the Mayor of the city of Kent issued on May 2, 1970, two days before the incident complained of, to call out the Ohio National Guard to suppress a riot, which proclamation read in part as follows:

I, LeRoy M. Satrom, Mayor of the City of Kent, Ohio, pursuant to the power invested in me as the chief magisterial officer of this City do hereby request the assistance of the Ohio National Guard to assist the Police Department and other local law enforcement agencies in restoring law and order in the City of Kent and particularly in the area of Kent State University and its environs.

Local law enforcement agencies can no longer cope with the situation and I instruct you to provide the necessary assistance to restore peace and order to our community.[1]

Even prior to that proclamation the County Prosecutor had obtained an injunction prohibiting assemblies within the city of Kent.

The Governor did not act to suppress the riot until after the mob had destroyed by fire the R.O.T.C. building located on the campus and had looted stores in the city of Kent. The Governor was authorized to act under Ohio Revised Code §§ 5923.21 and 5923.23.

This case is unprecedented. There is no reported case wherein the Governor of a state has ever been held liable for calling out the militia to suppress a riot or insurrection, and no case where a Governor's liability has been submitted to a petit jury for determination.

1. Plaintiffs' counsel conceded at the trial that the Governor had the right to call out the National Guard. As well stated by the panel on page 570:

In opening statements to the jury and in colloquy with the district court and opposing counsel it was admitted by attorneys for the plaintiffs that there had been violent assemblies in Kent and on the campus of Kent State on Friday, Saturday and Sunday nights, May 1, 2 and 3. Counsel conceded that Governor Rhodes had the right to call in the National Guard "because of the violence which had occurred, because it was unexcusable [sic], unjustifiable . . . ." It is admitted in the brief of the plaintiffs that students and other young people engaged in violence and vandalism in Kent, Ohio and on the campus during the three preceding days. On Saturday May 2nd the crowd burned the ROTC building on the campus and interfered with officers and firemen who attempted to control the fire. On Sunday May 3rd a crowd on the campus became disorderly and attempted to attack the university president's home. This crowd was finally dispersed by the National Guard after it had left the campus and caused further damage in downtown Kent. Policemen, firemen and national guardsmen were repeatedly assaulted while attempting to maintain and restore order during the three-day period.

The Supreme Court, in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), held that the District Court acted *prematurely* in dismissing the complaint and that it should have taken some evidence. The Court did not state that it had to be a full dress trial. The Court said on page 249, 94 S.Ct. on page 1693;

In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor, and took judicial notice that "mob rule existed at Kent State University." There was no opportunity afforded petitioners to contest the facts assumed in that conclusion.

The Supreme Court further stated at page 250, 94 S.Ct. at page 1693;

Further proceedings, either by way of *summary judgment* or by trial on the merits, are required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint. (Emphasis added)

In other words, the Court did not direct a full dress trial, which, in the present case, lasted nearly four months, and the defendants are confronted with a second trial because of the panel's reversal of the judgment for the defendants.

But now the "complaining parties" have been fully heard. Without any question mob rule did in fact prevail, not only on the Kent State campus but also in downtown Kent where stores had been looted, and the police were unable to cope with the mob.

The Governor was not present on the campus at any time during the rioting and the shooting. The Guard was in charge of its officer members.

Assuming that some members of the Guard did use excessive force to suppress the riot, this would impose no liability on the absent Governor because the Guard was in the command of the Adjutant General or his representative officers; nor would the Governor be personally liable if the Guard had not been properly trained as this function was performed solely by the Federal Government. See *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

In *Moyer v. Peabody,* 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909), Mr. Justice Holmes, who wrote the opinion for the Court, stated at page 85, 29 S.Ct. at page 236;

So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the Governor is the final judge and cannot be subjected to an action after he is out of office on the ground that he had not reasonable ground for his belief.

In *Sterling v. Constantin,* 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), Mr. Justice Hughes, in referring to the discretion vested in a Governor to determine whether an exigency existed requiring the militia, stated: "His decision to that effect is conclusive."

In *Scheuer v. Rhodes, supra,* the Supreme Court stated what the defendants were charged with, as follows:

In essence, the defendants are alleged to have "intentionally, recklessly, willfully and wantonly" caused an *unnecessary deployment* of the Ohio National Guard on the Kent State campus and, *in the same manner, ordered* the Guard members to perform allegedly illegal actions which resulted in the death of plaintiffs' decedents. (Emphasis added) (416 U.S. p. 235, 94 S.Ct. p. 1686)

There was not an iota of evidence offered at the trial to support the above-quoted language of the Supreme Court, charged by the plaintiffs in their complaints.

In *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Supreme Court, in an opinion written for the Court by Mr. Justice Harlan, held that the Acting Director of the Office of Rent Stabilization had absolute immunity in defense of a suit for alleged libel contained in a press release. The Court quoted with approval from an "admirably expressed" opinion of Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949).

*Barr v. Matteo* was recently followed by the Court of Appeals for the District of Columbia Circuit, and was held not to be eroded by recent decisions of the Supreme Court. *Expeditions Unlimited Acquatic Enterprises, Inc. v. Smithsonian Institution,* 184 U.S.App.D.C. 397–398, 566 F.2d 289–291, en banc (decided Sept. 16, 1977).

In *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971), a three-Judge Court, consisting of Judges Phillips, Bailey Brown and Robert McRae, Jr., dismissed a damage suit for wrongful death of a man who was shot by police who were investigating a robbery, and upheld the validity of a Tennessee statute declaratory of the common law authorizing the use of deadly force to effect an arrest of a felon fleeing from arrest.

That case was followed in another damage suit, *Beech v. Melancon,* 465 F.2d 425 (6th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973), in a per curiam opinion concurred in by Judges Edwards, McCree (in the result), and Kent.

These two cases were followed by this Court in *Wiley v. Memphis Police Dept.,* 548 F.2d 1247 (6th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 65, 54 L.Ed.2d 78, October 3, 1977.

In the present case, before any shots were fired by the Guard, the guardsmen were approached by a rock-throwing mob, who were uttering obscenities. A number of the members of the Guard testified that they were afraid for their lives. There is no evidence that any officer of the Guard issued an order to fire.

It seems to me that, in all fairness, if we are going to subject the Governor of Ohio to the ordeal of a second trial, when he has been absolved by a jury at the first trial, there should at least be some discussion of the basis for such action. There was no evidence that the Governor acted with malice.

In deciding whether to call out the militia the Governor and the Adjutant General certainly had the right to rely on the decisions of the Supreme Court which are cited above and which were in effect at the time. Subsequent decisions of the Supreme Court which may have imposed stricter standards and liability which did not theretofore exist, may not be retroactively applied without violation of due process under the Fifth Amendment. *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Neither Congress nor the federal courts may enact ex post facto laws.

One additional issue remains to be discussed, namely, the panel's treatment of "The Jury Issue."

It was the duty of the trial judge, when it was reported to him that an alleged threat and assault had been made on one of the jurors, immediately to interrogate that juror at a hearing, at which counsel for all of the parties would be present and would be permitted to participate. At such hearing the Court could have learned from the juror himself exactly what happened and whether he (the juror) had discussed the threats with other jurors. A record should have been made of the proceedings in order to assure appropriate appellate review. *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). There the Court said:

We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless.

Neither does anyone know in the present case, because the District Judge never conducted a hearing. He never interrogated the juror. The Judge never questioned other jurors to learn whether they knew anything about it.

The juror had apparently reported the alleged incident to a United States Marshal, and he reported it to the FBI and to the Court. The FBI interviewed the juror but made no written report. The United States Attorney was also consulted. The Judge indicated to counsel that he would excuse the juror but he never did excuse him. The Judge also reported the incident to the entire jury in open court. The FBI apparently decided to do nothing about it, which

leads to the inference that the alleged threat and assault may never have taken place.

Under these circumstances, the panel should have followed the guidelines of the Supreme Court in *Remmer v. United States, supra,* and should have remanded for an evidentiary hearing. Then, if it developed that the charge of tampering was unsupported, the panel could affirm. If the charge was supported and found to be prejudicial, the panel could then reverse. *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956).

The trial in the District Court, having lasted as it did for nearly four months, has caused terrific expense to the plaintiffs, as well as to the state of Ohio which defended the Guardsmen, the Governor, and the President of Kent State. Expense was also incurred in the defense of the criminal trials against the Guardsmen in the District Court, which trials resulted in directed verdicts of acquittal.

Also, as this Court as well as two Justices of the Supreme Court know, even now all is not quiet on the front.

I do not address other issues appearing in this case, namely, the liability of members of the Guard who fired no shots; the liability of officers of the Guard who issued no order to fire; the liability of officers and members of the Guard who were not even present during the riots and shootings.

En banc consideration should have been granted.

The judgment in favor of the Governor should be affirmed. The Jury Issue should be remanded to the District Court for an evidentiary hearing under the guidelines of *Remmer v. United States, supra.*